**FARMERS INSURANCE EXCHANGE,**
Appellant (Defendant),

v.

**Barbara SHIRLEY and Darol Shirley,**
Appellees (Plaintiffs).

No. 94–166.

Supreme Court of Wyoming.

May 8, 1998

Rehearing Denied June 5, 1998*.

* Justice Lehman would have granted the rehearing.

John A. Sundahl and George E. Powers, Jr.(argued), of Sundahl, Powers, Kapp & Martin, Cheyenne, for Appellant.

P. Richard Meyer (argued) and Robert N. Williams of Meyer & Williams, P.C., Jackson, for Appellees.

Before TAYLOR, C.J., and THOMAS, MACY, GOLDEN,** and LEHMAN, JJ.

THOMAS, Justice.

In this case we analyze our jurisprudential rules relating to punitive damages in light of the due process requirements set forth in *BMW of North America, Inc. v. Gore,* 517 U.S. 559, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996). The jury awarded compensatory damages to Barbara Shirley and Darol Shirley (the Shirleys) in the aggregate amount of $6,400 for the tort of breach of the duty of good faith and fair dealing by Farmers Insurance Exchange (Farmers). The dispositive issue under the law of our state is

** Chief Justice at the time of oral argument.

whether the Shirleys proved they suffered substantial other economic damages in addition to emotional distress to satisfy the damage element of their cause of action for first-party bad faith. *State Farm Mut. Auto. Ins. Co. v. Shrader,* 882 P.2d 813 (Wyo.1994). Other issues encompass instructional error on the part of the district court in permitting the jury to consider a standard other than intentional misconduct; the failure to grant a judgment as a matter of law because of insufficiency of evidence to justify a finding of bad faith; the disparate amount of punitive damages as compared to compensatory damages; the insufficiency of the evidence to justify punitive damages; and a claim of abuse of discretion in excluding the testimony of a rebuttal witness offered by Farmers. We hold the evidence of recoverable economic damages was not sufficient to support a verdict finding a breach of the duty of good faith and fair dealing. We conclude that, analyzed from the perspective of federal due process, our procedure for awarding punitive damages and reviewing such awards is constitutionally infirm. Because we remand for a new trial, we offer guidance for submission of the issue of punitive damages to the jury based upon the direction provided by the Supreme Court of the United States. We also hold the jury instructions given by the district court regarding first-party bad faith do not comport with Wyoming law; were prejudicially misleading for the jury; and did not afford due process of law to Farmers. Further, the amount awarded as punitive damages was not reasonably related to the compensatory damages awarded at trial. There was, however, no abuse of discretion by the trial judge in refusing to allow the rebuttal witness to testify. The case is reversed and remanded for further proceedings in accordance with this opinion.

The issues as Farmers states them in its Brief of Appellant are:

I. Did the District Court commit error when it submitted the case to the jury on the basis of instructions, which transformed the intentional tort of bad faith into a mere negligence action?

II. Did the District Court commit error when it overruled Defendant's Motion for Judgment as a Matter of Law despite uncontradicted and unimpeached evidence that Farmers Insurance Exchange, its agents and its employees never undertook any conscious or deliberate action intended to delay or avoid payment of Mrs. Shirley's claim for medical payments coverage?

III. Did the District Court commit error when it overruled Defendant's Motion for Judgment as a Matter of Law, or in the alternative, for New Trial and/or Remittitur, thereby permitting the jury's award of punitive damages to stand, despite the absence of any evidence to support a finding of willful or wanton misconduct and despite the absence of any reasonable relationship between the amount of actual compensatory damages awarded and the amount of punitive damages awarded?

IV. Did the District Court commit error when it refused to allow Defendant the opportunity to call an impeachment witness to refute Plaintiffs' trial testimony which directly contradicted Plaintiffs' sworn deposition testimony?

In a Supplemental Brief of Appellant, Farmers asserts this additional issue:

[V]. Did the District Court commit error, when it failed to instruct the jury that in a case based upon an alleged violation of the covenant of good faith and fair dealing the Plaintiff can only recover emotional distress damages where there is evidence of substantial other injury?

The issues articulated by the Shirleys in the Response Brief of Appellees are:

1. Was it error for the jury to find a bad faith breach of an insurance contract in this case, where the jury was properly instructed on this subject?

2. Where the jury awarded punitive damages under instructions which required a finding that "defendant must not only intentionally have breached his duty of good faith, but in addition must [be] guilty of oppression, fraud, or malice", does this finding make moot Defendant's contentions that the bad faith instructions did not set a sufficiently stringent standard for bad faith conduct?

3. Was a punitive damage instruction appropriate, where Defendant repeatedly failed to make timely payment of med pay claims of many of its insureds until complaints were made, continually threw away medical bills to avoid application of Wyoming's 45 day payment rule, and made a conscious decision to save money by not correcting these problems?

4. Where Defendant did not object to the punitive damage instructions or offer additional instructions, has it waived its right to contend that the jury was not properly instructed on the issue of punitive damages?

5. Has Defendant established that the District Court abused its discretion when it denied its motion to set aside or reduce punitive damages?

6. Did Plaintiffs sustain "substantial other damages" sufficient to sustain an award for emotional damages, where Plaintiffs, who were already in a physically debilitated condition, were subjected to threats of creditors, inconvenience, the need to retain counsel, a lawsuit, and who demonstrated outward symptoms of, and sought medical treatment for, such emotional distress[?]

7. Has Defendant established that the District Court abused its discretion, when it prohibited it from calling a non-listed witness to testify?

We begin by reviewing the demands of due process of law the Supreme Court of the United States has inscribed upon the law of punitive damages. In *BMW* the Supreme Court capped a series of cases addressing punitive damages by holding that the award of punitive damages was grossly excessive and went beyond the constitutional limit imposed by the due process clause of the Constitution of the United States. The history of the treatment of this issue by the Supreme Court of the United States must be perceived as somewhat tortured, but in *BMW* the court articulated a majority opinion that permitted Justice O'Connor to shift from her previous dissenting positions and join in the majority opinion, while also joining in the concurring opinion authored by Justice Breyer. The

court not only has articulated a demand for objective standards as distinguished from subjective standards for awarding punitive damages, but it has signaled a future requirement that for due process to be present those objective standards should be given to the jury in the form of instructions. If the objective standards are not communicated to the jury, then the invocation of such standards only for the purposes of review would infringe upon the right of the parties to a jury trial.

*BMW* builds upon the decisions of the Supreme Court of the United States in *Pacific Mut. Life Ins. Co. v. Haslip*, 499 U.S. 1, 111 S.Ct. 1032, 113 L.Ed.2d 1 (1991), and *TXO Production Corp. v. Alliance Resources Corp.*, 509 U.S. 443, 113 S.Ct. 2711, 125 L.Ed.2d 366 (1993). The majority in *BMW* recognizes that punitive damages may be imposed to further the legitimate interests of any state in punishing unlawful conduct and deterring its repetition. The primary role of the states in the articulation of state policy is acknowledged, and indeed the split between the dissenting faction of the court and the majority is simply over the appropriate stance of responsible federalism. The key to the majority position is found in its statement, "[e]lementary notions of fairness enshrined in our constitutional jurisprudence dictate that a person receive fair notice not only of the conduct that will subject him to punishment but also of the severity of the penalty that a State may impose." *BMW*, 517 U.S. at 574, 116 S.Ct. 1589 (footnote omitted). The court then invokes three guide posts, each of which is said to demonstrate that *BMW* did not receive adequate notice of the magnitude of the sanction that might be imposed, resulting in the court's conclusion that the award of punitive damages against BMW was grossly excessive.

Those three guide posts are the degree of reprehensibility; the disparity between the harm or potential harm suffered and the award of punitive damages; and the difference between punitive damages and the civil penalties authorized or imposed in comparable cases. The court alluded to the application by the Supreme Court of Alabama of the factors articulated in *Green Oil Co. v. Horns-*

*by*, 539 So.2d 218, 223–24 (Ala.1989), which had been approved by the Supreme Court of the United States in *Haslip*, 499 U.S. at 21–22, 111 S.Ct. 1032. While apparently not intended to be exclusive, the seven factors adopted from the concurring opinion of Justice Houston, in *Aetna Life Ins. Co. v. Lavoie*, 505 So.2d 1050, 1062 (Ala.1987), are:

"(1) Punitive damages should bear a reasonable relationship to the harm that is likely to occur from the defendant's conduct as well as to the harm that actually has occurred. If the actual or likely harm is slight, the damages should be relatively small. If grievous, the damages should be much greater.

"(2) The degree of reprehensibility of the defendant's conduct should be considered. The duration of this conduct, the degree of the defendant's awareness of any hazard which his conduct has caused or is likely to cause, and any concealment or "cover-up" of that hazard, and the existence and frequency of similar past conduct should all be relevant in determining this degree of reprehensibility.

"(3) If the wrongful conduct was profitable to the defendant, the punitive damages should remove the profit and should be in excess of the profit, so that the defendant recognizes a loss.

"(4) The financial position of the defendant would be relevant.

"(5) All the costs of litigation should be included, so as to encourage plaintiffs to bring wrongdoers to trial.

"(6) If criminal sanctions have been imposed on the defendant for his conduct, this should be taken into account in mitigation of the punitive damages award.

"(7) If there have been other civil actions against the same defendant, based on the same conduct, this should be taken into account in mitigation of the punitive damages award."

*Green Oil*, 539 So.2d at 223–24.

The history of punitive damages in our jurisdiction demonstrates that juries are given only very general instructions with respect to their determination of punitive

damages.[1] After *BMW*, our jurisprudential approach in Wyoming would not pass muster before the Supreme Court of the United States in an instance such as this in which the punitive damage award is 234.375 times the actual damage award. "When the ratio is a breathtaking 500 to 1, however, the award must surely 'raise a suspicious judicial eyebrow.' *TXO*, 509 U.S., at 482, 113 S.Ct. 2711, 125 L.Ed.2d 366 (O'CONNER, J., dissenting)." *BMW*, 517 U.S. at 583, 116 S.Ct. 1589. The Supreme Court would find the ratio in this case equally breathtaking, and our standards of review are totally subjective.[2]

*BMW* demands that we articulate objective standards for the imposition of punitive damages that can be communicated to the jury in the form of instructions and against which the imposition of the punitive award can be weighed in the process of judicial review. Otherwise we hazard litigants in our courts to future reversal by the Supreme Court of the United States because of the denial of due process of law resulting from the application of our current process.

With this concept before us, we turn to this case. Barbara Shirley was involved in an automobile accident on October 9, 1989. At the time of the accident, the Shirleys were insured under an automobile insurance policy issued by Farmers. This is the second time the case has been before this Court. In *State ex rel. Farmers Ins. Exchange v. District Court of Ninth Judicial Dist., County of Teton*, 844 P.2d 1099 (Wyo.1993), we disposed of the claim by the Shirleys that they had a right to recover against Farmers based upon the uninsured or underinsured motorist language in the Farmer's policy. This record is silent as to any impact that the pending claim for uninsured or underinsured motorist coverage may have had upon the claim for medical payments. We do know that Farmers was obligated under the terms of the policy to pay for medical bills resulting from the accident up to $5,000.

The accident was caused by another car which pulled out in front of Barbara Shirley, and she hit it. The collision occurred without fault on the part of Barbara Shirley, and she ultimately obtained a settlement from the other driver. As a result of the accident, she suffered injuries to her back and head, and she was hospitalized. The head injuries affected her memory and her ability to smell and to taste. She also suffered many symptoms of anxiety, including loss of sleep, fear of riding in a car, fear of staying home or being alone; and headaches. She sought and obtained both counseling and medical treatment for these symptoms, and she was on heavy medication.

When the Farmers' agent in Jackson learned of the accident, he suggested to the Shirleys that, if they wanted to submit a claim under their medical coverage provision, they could furnish medical bills to him, and he would forward them to the Cheyenne branch claims office. Ultimately, the medical bills incurred by Barbara Shirley exceeded

---

1. Here, for example, the jury was instructed:

 In considering the amount of punitive damages to be awarded against the defendant, you are instructed that the law provides no fixed standard as to the amount of such damages, but leaves the amount to the jury's discretion to be exercised without passion or prejudice.

 In determining the amount of punitive damages, if any, you should consider:
 (a) the financial condition or wealth of the defendant;
 (b) the activity of defendant causing the harm; and
 (c) the nature and extent of the injury suffered.

 Financial wealth is not the sole criteria, and it alone will not support a large award of damages when the injury does not support that award. Although there is no fixed ratio by which to determine the propriety of a punitive damages award, punitive damages should bear a reasonable relationship to the compensatory damages awarded.

2. While we always have recognized our authority to set aside or reduce an award of punitive damages, we uniformly suggested that we maintain a posture of flexibility and only do that on an *ad hoc* basis when the amount of the award is such as to shock our collective judicial conscience. *TZ Land & Cattle Co. v. Condict*, 795 P.2d 1204, 1210 (Wyo.1990); *Cates v. Eddy*, 669 P.2d 912, 922 (Wyo.1983); *Town of Jackson v. Shaw*, 569 P.2d 1246, 1253 (Wyo.1977); *Hall Oil Co. v. Barquin*, 33 Wyo. 92, 237 P. 255 (1925). Our basic premise is that the amount of punitive damages is largely in the discretion of the finder of fact. *Town of Jackson*, 569 P.2d at 1251; *Petsch v. Florom*, 538 P.2d 1011, 1014 (1975); *Wilson v. Hall*, 34 Wyo. 465, 244 P. 1002 (1926).

the $5,000 limitation on coverage. Barbara Shirley testified that she or her husband first began to take bills to the office of the Farmer's agent in December of 1989 or January of 1990. Farmers did open a claims file for Barbara Shirley on January 24, 1990. The Shirleys continued to take medical bills to the insurance agent until February of 1990. After that, the Shirleys began to rely upon their attorney to handle the processing of their claims for medical payments under their insurance policy.

This was the same attorney who was representing the Shirleys in their action against the other driver. He called the Farmers' agent some two or three times prior to February 15, 1990 to find out what was happening with respect to the medical payments claim. The agent advised that he had sent the bills to the branch office in Cheyenne. The medical bills received by the Shirleys after the end of February, 1990, were delivered to their attorney because no payments for the medical coverage had been received in response to furnishing the bills to the Farmers' agent. The attorney and his secretary testified that the Shirleys became notably very angry and disillusioned because they were unable to pay medical bills and were worried about their credit rating.

The attorney and his secretary also testified that, on January 29, February 20, and February 27 of 1990, they sent medical bills to an adjuster for Farmers in a different community. Early in April, the attorney copied all the medical bills in his possession and gave them to the Shirleys to take to the agent in Jackson. On April 23, 1990, the agent called the branch office to advise that the claim exceeded the policy limits. On April 26, 1990, the attorney again had all the medical bills in his possession copied and mailed to the agent. During this time, the emotional strain on the Shirleys was evident, and their demeanor was worsening. On July 23, 1990, the attorney copied and, for the last time, sent all the medical bills in his possession to the Farmers' agent.

On August 1, 1990, the agent left a message for the Shirleys' attorney stating that Farmers had sent a check to Barbara Shirley. On August 9, the attorney wrote a letter to the branch office endeavoring to confirm that payment was being made. On August 13, 1990, the attorney sent a letter to the agent stating that the Shirleys had not received the check. On August 17, 1990, the Shirleys filed an action to recover the medical benefits under the policy and for breach by Farmers of its duty of good faith and fair dealing. The Shirleys cashed a check for $5,000 from Farmers on August 21, 1990.

At trial, an ex-employee of Farmers testified that Farmers office staff continually threw away medical bills to avoid application of Wyoming's 45-day payment rule. She had no knowledge of that actually happening with respect to the Shirleys' bills, but she asserted that it was a common practice instigated by the claims clerical supervisor.

Following a jury trial, the jury returned a verdict finding that Farmers had breached the covenant of good faith and fair dealing with the Shirleys and had violated the provisions of WYO. STAT. § 26–15–124 (1991), resulting in liability for attorney's fees and interest. The jury also found that Farmers was subject to punitive damages. The jury awarded attorney's fees in the amount $2,000 and damages in the amount of $1,400 to Barbara Shirley and $5,000 to Darol Shirley. In a separate verdict, the jury imposed punitive damages against Farmers in the amount of $1,500,000. Farmers has appealed from the Judgment on Jury Verdict entered on March 7, 1994.

■ We turn first to the dispositive issue, whether the Shirleys established the damage element of their claim for breach of the implied covenant of good faith and fair dealing. Farmers raised this issue by virtue of its supplemental brief relying upon our decision in *Shrader*. We there said:

We hold the scope of available compensatory damages for a breach of the duty of good faith and fair dealing includes damages for harm to pecuniary interests and emotional distress. *Crisci [v. Security Ins. Co. of New Haven, Conn.*, 66 Cal.2d 425] 58 Cal.Rptr. [13,] at 19, 426 P.2d [173,] at 179 [ (1967) ]. There is a limitation, however, upon the recovery of damages for emotional distress for a breach of

this duty. *Gruenberg* [v. *Aetna Ins. Co.,* 9 Cal.3d 566], 108 Cal.Rptr. [480,] at 489, 510 P.2d [1032 ,] at 1041 [ (1973) ]; *Anderson* [v. *Continental Ins. Co.,* 85 Wis.2d 675], 271 N.W.2d [368,] at 378 [ (1978) ]. **We agree with the court in *Gruenberg,* that to recover damages for emotional distress, the insured must allege that as a result of the breach of the duty of good faith and fair dealing, the insured has suffered substantial other damages, such as economic loss, in addition to the emotional distress.** *Gruenberg,* 108 Cal. Rptr. at 489, 510 P.2d at 1041. *See* Restatement (Second) of Torts, *supra,* at § 905 cmt. c. The economic losses may include loss of earnings, inability to pay creditors, loss of business, costs of litigation brought against the insured as a result of the breach and medical expenses. *Gruenberg,* 108 Cal.Rptr. at 489–90, 510 P.2d at 1041–42. This limitation is imposed to prevent fictitious claims for emotional distress and preserve judicial resources. *Crisci,* 58 Cal.Rptr. at 19, 426 P.2d at 179.

The Shraders alleged substantial damages for loss of earnings as a part of their cause of action for breach of the duty of good faith and fair dealing. Therefore, the jury was entitled to receive evidence of damages for emotional distress. We do not find prejudicial error in the giving of Instruction No. 31.

*Shrader,* 882 P.2d at 833–34 (emphasis added).

Our opinion in *Shrader* was filed after this case had been tried. In the amended complaint, the Shirleys arguably allege economic loss in that they allege "plaintiffs' credit has been damaged * * *" and "[d]amage to credit and credit reputation of the plaintiffs * * *." They also allege damages for emotional distress. Farmers contends, however, that the Shirleys did not demonstrate "substantial other damages" aside from emotional distress. *Shrader* was decided upon the pleadings, as was *Gruenberg,* but, if a plaintiff must allege "substantial other damages, such as economic loss," it is essential to prove those damages at trial.

The record discloses the following colloquy between counsel and Barbara Shirley:

Q. Have you had any problems in terms of getting credit which you attribute to your failure to pay the medical bills on time?

A. Have I applied for credit?

Q. At any time and been denied?

A. Yes.

Q. When was that?

A. I want to say December of '91. I applied for a JC Pennys credit card. I was denied. And also a Broadway card which is a store in California. A department store.

Q. Were you given any reasons for your denials?

A. They told me—

\* \* \* \* \* \*

Q. Without asking you to relate any conversations, do you believe that those denials were related to your failure to pay these hospital bills on time?

[Counsel for Farmers]: Objected to as speculative. And also, Your Honor, this does still bring up the other point. There was a specific request for any documents that they might have to evidence any type of loss of credit or damage of credit.

Q. Let me ask that question, Your Honor. Do you have any documents that reflect the denial of those?

A. Yes. I might still have the letters. I'm not sure if I do but I might have them.

On cross-examination about economic damages Barbara Shirley testified:

Q. All right. Can I move past that now to another segment of issues on damage? Did you ever suffer any loss of income because of anything that Farmers did or failed to do?

A. No.

Q. Did you suffer any economic loss or financial loss because of anything that Farmers did or failed to do?

A. Could you repeat that?

Q. Yeah. Did you ever suffer any financial or economic loss because of what Farmers did or failed to do?

A. Financially?

Q. Financial loss, yes.

A. Sure. Because I had to take money we didn't have and pay some of the bills so they wouldn't go into collection. I couldn't do it to all of them but I did do to some of them.

Q. Weren't you able to work everything out with all the health care providers for arranging for payment or holding them off until you got the money from the Cleveland settlement?

A. Not from all of them, no.

Q. All right. Well, there was actually one outfit that ultimately did file a lawsuit against you; isn't that right?

A. No, I want to say there's two. I'm just trying to remember. I'm not sure.

Q. We know that in October of 1990, the radiologist here in Jackson filed a suit for about $565.00; do you recall that?

A. That's right.

Q. And you immediately went in and worked out a payment schedule with them?

A. Yes.

Q. Did you need the services of any lawyer to do that?

A. No.

Q. Was there any other person that ever filed suit against you because of any financial problems? Person or entity, I guess I should say. Group.

A. Well, there was a doctor in Lander and I can't recall his name right now that turned it over to collection, and it stayed on my record for like 7 years, or will.

Q. All right.

A. Because he did not want to work out the payments and he didn't care.

Q. So the Lander doctor did not?

A. And he didn't care that it was an insurance thing.

\* \* \* \* \* \*

Q. Well, did you pay the doctor in Lander?

A. Did I pay him?

Q. Yes.

A. No.

Q. Are you paying him?

A. No.

Q. Have you made any effort to pay him?

A. No, because he said it wasn't going to do any good to pay him because he already turned it in to—it went on my TRW.

Q. I guess my question is this: Did the doctor in Lander ever sue you for the money or any collection agency sue you for the money that the doctor in Lander owed—or that you owed the doctor in Lander? Excuse me.

A. No. He just—it just went to when I called and tried to make payments he told me that it was too late, and that it would just show on my record for 7 years.

▆▆▆▆ In light of what we said in *Shrader*, this record is not adequate to show substantial other damages beyond the damages for emotional distress. Furthermore, the jury was not instructed with respect to such a requirement. We have said that a jury is not permitted to speculate or engage in conjecture in awarding damages. *Martinez v. City of Cheyenne*, 791 P.2d 949, 960 (Wyo. 1990); *Reposa v. Buhler*, 770 P.2d 235, 238 (Wyo.1989); *Reiman Const. Co. v. Jerry Hiller Co.*, 709 P.2d 1271, 1277 (Wyo.1985); *Krist v. Aetna Cas. & Sur.*, 667 P.2d 665, 672 (Wyo.1983). Had the jury been properly instructed as to the *Shrader* requirement of economic damages, the jury could not have determined such damages other than by speculation or conjecture. The dilemma confronting the jury is dramatically illustrated by this note which was sent to the judge:

> If we decide to award damages to Barbara Shirley and Darol Shirley, what basis do we use as a foundation to decide on a dollar amount?

▆▆▆▆ The Shirleys contend that their bills for medical and psychological treatment constitute other economic damages. These bills clearly were related to Barbara Shirley's physical injuries or to stress from her situation. As such, they may serve to demonstrate damages for emotional distress, but they do not establish other economic damage. The same is true with respect to reliance

upon fees owed to their attorney. We do not choose to undermine *Shrader* by treating the fees of an attorney to challenge the actions of the insurer as other economic damages because that would automatically establish other economic damage in every action for breach of the implied covenant of good faith and fair dealing.

 We reverse the Judgment on Jury Verdict entered in this case because of the failure of the record to demonstrate compliance with the rule in *Shrader*. Normally, we would not remand for a new trial under these circumstances, but fairness and justice, even due process of law, demand that we afford the Shirleys the opportunity to establish a case under the *Shrader* rule. At the time this case was tried, they could not have anticipated the necessity for proving other economic damages. In that regard, we hold that a special verdict form should be submitted to the jury that will separate economic damages, established by the evidence, from damages for emotional distress, and identify those damages with specificity, so that it will be clear in any instance how the jury arrived at its damage award.

Since we are remanding this case for a new trial, we address, as is our custom, those questions that are likely to arise upon retrial. As we said in *Danculovich v. Brown*, 593 P.2d 187, 194 (Wyo.1979):

Although the foregoing is determinative of this case, the other two issues presented on appeal will probably arise again on the retrial of this case. In such instance "it is our right, if it is not our duty, to decide the question." *Chicago & N.W. Ry. Co. v. City of Riverton*, 70 Wyo. 119 [sic] [84], 127, 247 P.2d 660, 663 (1952); *Bartlett v. State*, Wyo., 569 P.2d 1235, 1241 (1977); *Goodman v. State*, Wyo., 573 P.2d 400, 413 (1977).

We have followed this course in more recent cases. *Shrader*, 882 P.2d at 831; *Rhoades v. K–Mart Corp.*, 863 P.2d 626, 631 (Wyo.1993); *L.U. Sheep Co. v. Board of County Com'rs of County of Hot Springs*, 790 P.2d 663, 665 (Wyo.1990); *Rocky Mountain Oil and Gas Ass'n v. State*, 645 P.2d 1163, 1167 (Wyo. 1982); *Madison v. Marlatt*, 619 P.2d 708, 714 (Wyo.1980); *McGuire v. McGuire*, 608 P.2d

1278, 1286 (Wyo.1980). In resolving these questions, we address the due process concerns expressed in *BMW*, and incorporate those features in our decision.

We begin with the claim by Farmers that Instructions Nos. 16 and 17 incorporated an improper standard for finding breach of the implied covenant of good faith and fair dealing. Those instructions read:

### INSTRUCTION NO. *16*

The law implies a duty of good faith dealing in every policy of insurance. The breach of this duty gives rise to an action for bad faith against an insurance company. To prevail on an action for bad faith against the insurance company, plaintiff must prove:

1. That there was/is a policy of insurance;

2. That the plaintiff was/is an insured under the policy of insurance and was/is entitled to claim benefits directly under the policy;

3. That the insurer denied or delayed payment of benefits that were owed to plaintiff under the policy without a reasonable basis for doing so;

4. That the conduct of the insurer caused plaintiff damages; and

5. That the insurer acted with knowledge of, or in reckless disregard of, the absence of a reasonable basis to deny or delay payment of benefits. Such knowledge or reckless disregard can be inferred if a reasonable insurer proceeding under the facts and circumstances of an adequate investigation would not have denied or delayed payment of the benefits.

GIVEN:

*s/D. Terry Rogers*
District Judge

### INSTRUCTION NO. *17*

The insurance company may be subject to liability for bad faith even though it has honored the express terms of its policy if you find that it violated the covenant of good faith and fair dealing in the manner

in which it investigated, handled or denied the claim, and the plaintiff was damaged thereby.

Under certain circumstances such actions as inadequately investigating a claim; unreasonably withholding and delaying benefits under an insurance policy; forcing an insured to litigate or seek arbitration of a claim, knowing it has no substantial grounds to reject the claim; engaging in deception; or spoilation of evidence could constitute bad faith on the part of an insurance company.

It is up to the jury to determine whether or not, based on the evidence in this case and the instructions as a whole, whether or not the defendant in this case acted in bad faith.

The burden is on the plaintiffs to prove the allegations of bad faith by a preponderance of the evidence.

GIVEN:

_s/ D. Terry Rogers_

D. Terry Rogers

District Judge

 Farmers complains that these instructions had the effect of submitting the issue of breach of the implied covenant of good faith and fair dealing to the jury on a simple negligence standard. The Shirleys argue that the absence of any proper standard for breach of the covenant of good faith and fair dealing, if the instruction is defective, was cured by the standard articulated in the instruction with regard to punitive damages. Both arguments miss the essence of the thorny question of whether the standard for denial of insurance contract benefits is readily transferrable to a delay of payment. Apparently the trial court assumed this to be appropriate, probably relying upon a casual quote in *McCullough v. Golden Rule Ins. Co.,* 789 P.2d 855, 860 (Wyo.1990), from *Anderson,* 271 N.W.2d at 376–77, which has been repeated in claims denial cases. The only bad faith case in which we have addressed delay is *Darlow v. Farmers Ins. Exchange,* 822 P.2d 820, 823–29 (Wyo.1991). We are satisfied that in a payment delay case, the law emphasizes the intentional nature of the tort of bad faith. As we said in *Darlow,* 822 P.2d at 826:

First, the court determined that the insurer's conduct was unreasonable by delaying the insured's claim against the tort-feasor. *Id.,* 726 P.2d at 573 [*Rawlings v. Apodaca,* 151 Ariz. 149, 726 P.2d 565 (1986)]. The court then determined that the insurer acted intentionally without fairly debatable grounds using deceit, nondisclosure, reneging on promises, violation of industry custom and deliberate attempts to obfuscate. *Id.,* [151 Ariz. at 160–61] 726 P.2d at 576–77. *Rawlings* clearly followed the two-step test outlined in *McCullough* and *Anderson* for first-party liability. *Clearwater v. State Farm Mut. Auto. Ins. Co.,* 164 Ariz. 256, 792 P.2d 719 (1990); *accord, White v. Unigard Mut. Ins. Co.,* 112 Idaho 94, 730 P.2d 1014 (1986).

We conclude that in a first-party bad faith case involving a delay of payment as distinguished from a denial of payment, the jury must be instructed with clarity that the insurer, not only acted without justification, but acted intentionally and used deceit, nondisclosure, reneging on promises, violation of industry custom and deliberate attempts to obfuscate. Such language should appropriately be substituted for paragraphs 3 and 5 of Instruction No. 16, as given by the trial court in this case.

 We also conclude that instruction No. 17, as given to the jury, was erroneous. It specifically alludes to denial of a claim. Further it encompasses a laundry list of examples that might appropriately be incorporated in an instruction such as No. 16, if any of them were established by the evidence. Its basic defect, however, is the implication that any of those factors could establish bad faith without encompassing the further requirement that the actions be taken with knowledge of or a reckless disregard of any justification for delaying payment. Again we emphasize the requirement of the law that a delay must be intentional.

 We next turn our attention to the claim of error in overruling [Farmers'] Motion for Judgment as a Matter of Law and, in the Alternative, Motion for New Trial and/or Remittitur with respect to the question of punitive damages. The law presented to this

jury on the question of punitive damages is captured in instructions No. 32 and No. 36 which read as follows:

### INSTRUCTION NO. 32

Plaintiff seeks from the defendant additional damages known in the law as exemplary or punitive damages.

Punitive damages are allowable, in a proper case, for the purpose of punishment of the defendant and to deter the defendant and others similarly situated from engaging in similar conduct in the future.

If you find that the plaintiff has suffered and is entitled to recover other damages as a result of the conduct of the defendant, you may in your sole judgment and discretion award additional punitive damages against the defendant if, and only if, you find by a preponderance of the evidence that the defendant was guilty of willful and wanton misconduct.

Willful and wanton misconduct is the intentional doing of an act, or an intentional failure to do an act, in reckless disregard of the consequences, and under such circumstances and conditions that a reasonable person would know, or have reason to know, that such conduct would, in a high degree of probability, result in harm to another.

GIVEN:

*s/D. Terry Rogers*
District Judge

### INSTRUCTION NO. 36

In considering the amount of punitive damages to be awarded against the defendant, you are instructed that the law provides no fixed standard as to the amount of such damages, but leaves the amount to the jury's discretion to be exercised without passion or prejudice.

In determining the amount of punitive damages, if any, you should consider:

(a) the financial condition or wealth of the defendant;

(b) the activity of defendant causing the harm; and

(c) the nature and extent of the injury suffered.

Financial wealth is not the sole criteria, and it alone will not support a large award of damages when the injury does not support that award. Although there is no fixed ratio by which to determine the propriety of a punitive damages award, punitive damages should bear a reasonable relationship to the compensatory damages awarded.

GIVEN:

*s/D. Terry Rogers*
District Judge

While the accuracy of the language in instruction No. 32 must be conceded, it consists of a number of concepts taken out of context. We conclude that specific language from *Anderson,* 271 N.W.2d at 379, quoted, with approval, in *McCullough,* 789 P.2d at 861, should be given as follows:

> [P]roof of a bad faith cause of action [does not] necessarily make[ ] punitive damages appropriate. * * * For punitive damages to be awarded in addition to compensatory damages for the tort, there must be a showing of an evil intent deserving of punishment or something in the nature of special ill-will or wanton disregard of duty or gross or outrageous conduct. * * * For punitive damages to be awarded, a defendant must not only intentionally have breached his duty of good faith, but in addition must have been guilty of oppression, fraud or malice * * *.

In addition, the special definitions, as found in *Mid–Continent Refrigerator Co. v. Straka,* 47 Wis.2d 739, 178 N.W.2d 28 (1970), should be given as they specifically were adopted by this court.

█ It is important for the trial court to distinguish the tort of breach of the duty of good faith and fair dealing and the standard for recovery from the standard for recovery of punitive damages. The former requires only that the defendant act intentionally. The latter requires more than intentional action, and encompasses "an intent to do an act, or an intent to not do an act, in reckless disregard of the consequences, and under such circumstances and conditions that a rea-

sonable [person] would know, or have reason to know, that such conduct would, in a high degree of probability, result in substantial harm to another." *Danculovich,* 593 P.2d at 193. They are to be awarded only for "conduct involving some element of outrage, similar to that usually found in crime." *Weaver v. Mitchell,* 715 P.2d 1361, 1369 (Wyo.1986). The jury should be so advised, and the point should be clearly communicated that intentional action does not necessarily involve wilful and wanton misconduct.

■ We find this record entirely silent with respect to the requirements for imposition of punitive damages upon an employer that we articulated in *Campen v. Stone,* 635 P.2d 1121, 1125 (Wyo.1981). We there specifically adopted the requirements for imposition of punitive damages upon an employer incorporated in the RESTATEMENT (SECOND) OF TORTS § 909 (1977) and the RESTATEMENT (SECOND) OF AGENCY § 217C (1957). We there said:

> Both of these sections provide that:
>
> "Punitive damages can properly be awarded against a master or other principal because of an act by an agent if, but only if,
>
> "(a) the principal or a managerial agent authorized the doing and the manner of the act, or
>
> "(b) the agent was unfit and the principal or a managerial agent was reckless in employing or retaining him, or
>
> "(c) the agent was employed in a managerial capacity and was acting in the scope of employment, or
>
> "(d) the principal or a managerial agent of the principal ratified or approved the act."

This rule was maintained and reaffirmed in *Condict v. Condict,* 664 P.2d 131, 136 (Wyo. 1983). While Farmers may have waived such error by not tendering an instruction incorporating the requirements of *Campen,* given our policy posture with respect to punitive damages, a trial court should always give that instruction, as a fundamental aspect of the law of punitive damages, when punitive damages are sought from a principal or an employer.

■ With respect to instruction No. 36, we must acknowledge that it incorporates existing law in Wyoming. We reexamine the validity of that instruction, however, in light of the teaching of *BMW.* Our precedent probably fits generally within the three guide posts articulated by the Supreme Court in *BMW.* "[T]he activity of defendant causing the harm * * *," might be equated with reprehensibility as would apparently, "the nature and extent of the injuries suffered." These factors should be given more specificity, however, in accord with those adopted in *BMW* from *Haslip,* 499 U.S. at 21–22, 111 S.Ct. 1032, which in turn adopted them from *Green Oil,* 539 So.2d at 223–24. The jury should be told:

> "(1) Punitive damages should bear a reasonable relationship to the harm that is likely to occur from the defendant's conduct as well as to the harm that actually has occurred. If the actual or likely harm is slight, the damages should be relatively small. If grievous, the damages should be much greater.
>
> "(2) The degree of reprehensibility of the defendant's conduct should be considered. The duration of this conduct, the degree of the defendant's awareness of any hazard which his conduct has caused or is likely to cause, and any concealment or "cover-up" of that hazard, and the existence and frequency of similar past conduct should all be relevant in determining this degree of reprehensibility.
>
> "(3) If the wrongful conduct was profitable to the defendant, the punitive damages should remove the profit and should be in excess of the profit, so that the defendant recognizes a loss.
>
> "(4) The financial position of the defendant would be relevant.
>
> "(5) All the costs of litigation should be included, so as to encourage plaintiffs to bring wrongdoers to trial.
>
> "(6) If criminal sanctions have been imposed on the defendant for his conduct, this should be taken into account in mitigation of the punitive damages award.
>
> "(7) If there have been other civil actions against the same defendant, based on

the same conduct, this should be taken into account in mitigation of the punitive damages award."

In arriving at an appropriate amount of punitive damages with respect to insurance carriers, it would be appropriate to give as an instruction WYO. STAT. § 26–1–107 (1997), pertaining to general criminal and civil penalties.

Until the position of the Supreme Court of the United States has been further established with regard punitive damages and due process of law, we are satisfied that the approach we recommend should meet the demands of the Court. While the Court stops short of requiring these factors to be given to the jury as instructions, we are satisfied that the only sensible approach is to tell the arbiter of punitive damages what the rules are. Consequently such instructions should be given.

 We treat only briefly the claim of error with respect to the failure of the trial court to grant the motion by Farmers for judgment as a matter of law. Our standard of review with respect to such motions, formerly styled a judgment not withstanding the verdict, is that we must "determine 'whether the evidence is such that without weighing the credibility of the witnesses, or otherwise considering the weight of the evidence, there can be but one conclusion reasonable persons could have reached * * *.' Id. [Erickson v. Magill, 713 P.2d 1182, 1186 (Wyo.1986)]. * * * We consider the evidence in the light most favorable to the party against whom the motion is directed, giving all reasonable and legitimate inferences to such evidence." Shrader, 882 P.2d at 836; Ames v. Sundance State Bank, 850 P.2d 607, 608–609 (Wyo.1993); Wilson v. McMahon, 831 P.2d 1152, 1154 (Wyo.1992); Inter–Mountain Threading, Inc. v. Baker Hughes Tubular Services, Inc., 812 P.2d 555, 558–559 (Wyo.1991); See Rhoades, 863 P.2d at 629; Carey v. Jackson, 603 P.2d 868, 877 (Wyo. 1979). We hold that the same standard of review is applicable to what is now denominated a judgment as a matter of law. Our examination of the evidence in this record, in light of this standard of review, persuades us that the trial court did not err in refusing to

grant the judgment as a matter of law. There was sufficient evidence to permit submission to the jury of the question of any conscious or deliberate action intended to delay the payment of the Shirleys' claims for medical payments coverage.

 We do not address the claim of error arising out of the exclusion of the impeachment witness. Such a ruling is within the discretion of the trial court, and will not be disturbed absent a demonstration of an abuse of discretion. It well may be that upon retrial there will be further opportunity to submit pretrial information which will resolve this particular problem. We cannot, however, fault the trial court for enforcement of its pretrial orders.

Reversed and remanded for further proceedings in accordance with this opinion.

LEHMAN, J., filed a dissenting opinion.

THOMAS, Justice, specially concurring.

I undertake a concurring opinion to an opinion of the court that I authored with a definite degree of trepidation. I have listened to the views of learned jurists with respect to the propriety of such an effort. Most found the concept unique, and beyond that their thoughts ranged from the position that it simply should not be permitted to the thought that at best it is a matter of bad form. I have concluded to press forward, however, on the premise that any other member of the Court who joined in the majority opinion could write separately if he so chose. I have concluded that the same prerogative should be available to the author.

The opinion of the court opts to reverse this case based upon trial error and remands for a new trial because the damage element of the cause of action for first-party bad faith articulated in State Farm Mut. Auto. Ins. Co. v. Shrader, 882 P.2d 813 (Wyo.1994), had not been promulgated at the time this case was tried. I feel that the Court needs to offer more leadership with respect to the concept of punitive damages in light of the reveille call sounded in BMW of North America, Inc. v. Gore, 517 U.S. 559, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996). In BMW the

Supreme Court of the United States capped a series of cases addressing the onset of punitive damages by holding that the award of punitive damages was grossly excessive and went beyond the constitutional limit required by the due process clause of the Constitution of the United States.

The history of the treatment of this issue by the Supreme Court of the United States must be perceived as somewhat tortured, but in *BMW* the court articulated a majority opinion that shifted Justice O'Connor from her previous dissenting positions so that she could join in the majority opinion while also joining in the concurring opinion authored by Justice Breyer. I admit to building upon the opinion of the court in *BMW,* but the court, in my opinion, not only was articulating a demand for objective standards as distinguished from subjective standards, it was signaling a future requirement. In order for due process to be honored those objective standards should be given to the jury in the form of instructions. If they are not, then the invocation of the objective standard for purposes of review would seriously infringe upon the right of the parties to a jury trial. Trial by jury is a classic example of the set of rights that our system perceives as due process. Due process surely must extend to the first stage of judicial proceedings that constitute the process for awarding punitive damages.

I find that the views of my dissenting brother on the Court and mine are quite consistent in this regard. The policy of the State of Wyoming with respect to the award of punitive damages is best addressed in the halls of the legislature. In the overall scheme of things, the better articulation of state policy relative to punitive damage awards could be achieved by legislative consideration. Certainly a broader evaluation of factors that impact state policy could be presented in the legislative forum without being limited to the issues between two parties or even two parties plus the several amici that might appear in our Court. In that regard, I call attention to the appendix to the dissenting opinion of Justice Ginsburg in the *BMW* case which I have reproduced as an appendix to this concurring opinion. Both my dissenting brother and I rely upon it in identifying our position.

For myself, I would favor the legislative adoption of an approach that would allocate punitive damages to the state coffers. This essentially is the same view advocated by the dissent. The present system is deftly compared to the proposed system in the remarks of a venireman in this case, who, when asked an attitudinal question about punitive damages, responded:

A. Well, I got strong feelings about a lot of, I guess, civilian people making big bucks on a case where they were unfortunate but end up getting rich off of it, I guess, from punitive damages. If there's a lot of money to be made off of it it shouldn't go to the person, it should go to the State or county government.

After affording some fair apportion to the party to the litigation, and some fair award for attorney's fees, the balance of what must be perceived as a civil fine would flow to state coffers, perhaps to in some way redress the harmful situation that the punitive damages also address. That should be the first approach. Certainly there are ample legislative models to follow in achieving that purpose. Only if it became necessary in the future should a cap on punitive damages be sought. In Wyoming, there may well be a constitutional problem in that regard. Of course, we already have mandatory bifurcation of liability from punitive damages in the submission to the jury.

Until some additional reform occurs, however, the choices that confront this Court are to adhere to our historical methodology, which I believe would not satisfy the constitutional concerns of the United States Supreme Court; invoke the factors found in *Green Oil Co. v. Hornsby,* 539 So.2d 218, 223–24 (Ala.1989), in our review and reduce the punitive damages according to our judgment; apply some arbitrary multiplying ratio as a ceiling; or submit the *Green Oil Co.* factors to the jury to use in the first instance. In my opinion, this latter course best preserves the right of the parties to have the issue tried to the jury in a way that would satisfy the constitutional concerns of the United States Supreme Court. Examples of

the second and third options are to be found in the opinion of the Supreme Court of Alabama upon remand of *BMW* from the United States Supreme Court. *BMW of North America, Inc. v. Gore,* 701 So.2d 507 (Ala. 1997). If the punitive damages award in this case were to be reviewed by that court, I believe it fair to say that it would be reduced to not more than $25,000.

Given the potential choices that I envision, I am satisfied that the majority opinion in this case correctly balances the right to a jury trial with the constitutional due process requirements with respect to punitive damages.

## APPENDIX TO OPINION OF GINSBURG, J.

### STATE LEGISLATIVE ACTIVITY REGARDING PUNITIVE DAMAGES

State legislatures have in the hopper or have enacted a variety of measures to curtail awards of punitive damages. At least one state legislature has prohibited punitive damages altogether, unless explicitly provided by statute. See N.H.Rev.Stat. Ann. § 507:16 (1994). We set out in this appendix some of the several controls enacted or under consideration in the States. The measures surveyed are: (1) caps on awards; (2) provisions for payment of sums to state agencies rather than to plaintiffs; and (3) mandatory bifurcated trials with separate proceedings for punitive damages determinations.

### I. CAPS ON PUNITIVE DAMAGES AWARDS

• *Colorado* Colo.Rev.Stat. §§ 13–21–102(*l*)(a) and (3) (1987) (as a main rule, caps punitive damages at amount of actual damages).

• *Connecticut* Conn. Gen.Stat. § 52–240b (1995) (caps punitive damages at twice compensatory damages in products liability cases).

• *Delaware* H.R. 237, 138th Gen. Ass. (introduced May 17, 1995) (would cap punitive damages at greater of three times compensatory damages, or $250,000).

• *Florida* Fla. Stat. §§ 768.73(*l*)(a) and (b) (Supp.1992) (in general, caps punitive damages at three times compensatory damages).

• *Georgia* Ga.Code Ann. § 51–12–5.1 (Supp.1995) (caps punitive damages at $250,000 in some tort actions; prohibits multiple awards stemming from the same predicate conduct in products liability actions).

• *Illinois* H. 20, 89th Gen. Ass.1995–1996 Reg. Sess. (enacted Mar. 9, 1995) (caps punitive damages at three times economic damages).

• *Indiana* H. 1741, 109th Reg. Sess. (enacted Apr. 26, 1995) (caps punitive damages at greater of three times compensatory damages, or $50,000).

• *Kansas* Kan. Stat. Ann. §§ 60–3701(e) and (f) (1994) (in general, caps punitive damages at lesser of defendant's annual gross income, or $5 million).

• *Maryland* S. 187, 1995 Leg. Sess. (introduced Jan. 27, 1995) (in general, would cap punitive damages at four times compensatory damages).

• *Minnesota* S. 489, 79th Leg. Sess., 1995 Reg. Sess. (introduced Feb. 16, 1995) (would require reasonable relationship between compensatory and punitive damages).

• *Nevada* Nev.Rev.Stat. § 42.005(*l*) (1993) (caps punitive damages at three times compensatory damages if compensatory damages equal $100,000 or more, and at $300,000 if the compensatory damages are less than $100,000).

• *New Jersey* S. 1496, 206th Leg., 2d Ann. Sess. (1995) (caps punitive damages at greater of five times compensatory damages, or $350,000, in certain tort cases).

• *North Dakota* N.D. Cent.Code § 32–03.2–11(4) (Supp.1995) (caps punitive damages at greater of two times compensatory damages, or $250,000).

• *Oklahoma* Okla Stat., Tit. 23, §§ 9.1(B)-(D) (Supp.1996) (caps punitive damages at greater of $100,000, or actual damages, if jury finds defendant guilty of reckless disregard; and at greatest of $500,000, twice actual damages, or the benefit accruing to defendant from the injury-causing conduct, if jury

finds that defendant has acted intentionally and maliciously).

● *Texas* S. 25, 74th Reg. Sess. (enacted Apr. 20, 1995) (caps punitive damages at twice economic damages, plus up to $750,000 additional noneconomic damages).

● *Virginia* Va.Code Ann. § 8.01–38.1 (1992) (caps punitive damages at $350,000).

## II. ALLOCATION OF PUNITIVE DAMAGES TO STATE AGENCIES

● *Arizona* H.R. 2279, 42d Leg., 1st Reg. Sess. (introduced Jan. 12, 1995) (would allocate punitive damages to a victims' assistance fund, in specified circumstances).

● *Florida* Fla. Stat. §§ 768.73(2)(a)-(b) (Supp.1992) (allocates 35% of punitive damages to General Revenue Fund or Public Medical Assistance Trust Fund); see *Gordon v. State*, 585 So.2d 1033, 1035–1038 (Fla.App. 1991), aff'd, 608 So.2d 800 (Fla.1992) (upholding provision against due process challenge).

● *Georgia* Ga.Code Ann. § 51–12–5.l(e)(2) (Supp.1995) (allocates 75% of punitive damages, less a proportionate part of litigation costs, including counsel fees, to state treasury); see *Mack Trucks, Inc. v. Conkle*, 263 Ga. 539, 540–543, 436 S.E.2d 635, 637–639 (Ga.1993) (upholding provision against constitutional challenge).

● *Illinois* Ill. Comp. Stat. ch. 735, § 5/2–1207 (1994) (permits court to apportion punitive damages among plaintiff, plaintiff's attorney, and Illinois Department of Rehabilitation Services).

● *Indiana* H. 1741, 109th Reg. Sess. (enacted Apr. 26, 1995) (subject to statutory exceptions, allocates 75% of punitive damages to a compensation fund for violent crime victims).

● *Iowa* Iowa Code § 668A.1(2)(b) (1987) (in described circumstances, allocates 75% of punitive damages, after payment of costs and counsel fees, to a civil reparations trust fund); see *Shepherd Components, Inc. v. Brice Petrides–Donohue & Assoc., Inc.*, 473 N.W.2d 612, 619 (Iowa 1991) (upholding provision against constitutional challenge).

● *Kansas* Kan. Stat. Ann. § 60–3402(e) (1994) (allocates 50% of punitive damages in medical malpractice cases to state treasury).

● *Missouri* Mo.Rev.Stat. § 537.675 (1994) (allocates 50% of punitive damages, after payment of expenses and counsel fees, to Tort Victims' Compensation Fund).

● *Montana* H. 71, 54th Leg. Sess. (introduced Jan. 2, 1995) (would allocate 48% of punitive damages to state university system and 12% to school for the deaf and blind).

● *New Jersey* S. 291, 206th Leg., 1994–1995 1st Reg. Sess. (introduced Jan. 18, 1994); A. 148, 206th Leg., 1994–1995 1st Reg. Sess. (introduced Jan. 11, 1994) (would allocate 75% of punitive damages to New Jersey Health Care Trust Fund).

● *New Mexico* H. 1017, 42d Leg., 1st Sess. (introduced Feb. 16, 1995) (would allocate punitive damages to Low–Income . Attorney Services Fund).

● *Oregon* S. 482, 68th Leg. Ass. (enacted July 19, 1995) (amending Ore.Rev.Stat. §§ 18.540 and 30.925, and repealing Ore.Rev. Stat. § 41.315) (allocates 60% of punitive damages to Criminal Injuries Compensation Account).

● *Utah* Utah Code Ann. § 78–18–1(3) (1992) (allocates 50% of punitive damages in excess of $20,000 to state treasury).

## III. MANDATORY BIFURCATION OF LIABILITY AND PUNITIVE DAMAGES DETERMINATIONS

● *California* Cal. Civ.Code Ann. § 3295(d) (West Supp.1995) (requires bifurcation, on application of defendant, of liability and damages phases of trials in which punitive damages are requested).

● *Delaware* H.R. 237, 138th Gen. Ass. (introduced May 17, 1995) (would require, at request of any party, a separate proceeding for determination of punitive damages).

● *Georgia* Ga.Code Ann. § 51–12–5. 1(d) (Supp.1995) (in all cases in which punitive damages are claimed, liability for punitive

damages is tried first, then amount of punitive damages).

● *Illinois* H. 20, 89th Gen. Ass., 1995–1996 Reg. Sess. (enacted Mar. 9, 1995) (mandates, upon defendant's request, separate proceeding for determination of punitive damages).

● *Kansas* Kan. Stat. Ann. § 60–3701(a) and (b) (1994) (trier of fact determines defendant's liability for punitive damages, then court determines amount of such damages).

● *Missouri* Mo.Rev.Stat. §§ 510.263(*l*) and (3) (1994) (mandates bifurcated proceedings, on request of any party, for jury to determine first whether defendant is liable for punitive damages, then amount of punitive damages).

● *Montana* Mont.Code Ann. § 27–1–221(7) (1995) (upon finding defendant liable for punitive damages, jury determines the amount in separate proceeding).

● *Nevada* Nev.Rev.Stat. § 42.005(3) (1993) (if jury determines that punitive damages will be awarded, jury then determines amount in separate proceeding).

● *New Jersey* N.J. Stat. Ann. §§ 2A:58C–5(b) and (d) (West 1987) (mandates separate proceedings for determination of compensatory and punitive damages).

● *North Dakota* N.D. Cent.Code § 32.03.2–11(2) (Supp.1995) (upon request of either party, trier of fact determines whether compensatory damages will be awarded before determining punitive damages liability and amount).

● *Oklahoma* Okla. Stat., Tit. 23, §§ 9.1(B)-(D) (Supp.1995–1996) (requires separate jury proceedings for punitive damages); S. 443, 45th Leg., 1st Reg. Sess. (introduced Jan. 31, 1995) (would require courts to strike requests for punitive damages before trial, unless plaintiff presents *prima facie* evidence at least 30 days before trial to sustain such damages; provide for bifurcated jury trial on request of defendant; and permit punitive damages only if compensatory damages are awarded).

● *Virginia* H. 1070, 1994–1995 Reg. Sess. (introduced Jan. 25, 1994) (would require separate proceedings in which court determines that punitive damages are appropriate and trier of fact determines amount of punitive damages).

LEHMAN, Justice, dissenting.

I respectfully dissent. I take exception with the majority's conclusion that "[a]fter *BMW* [*of North America v. Gore,* 517 U.S. 559, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996) ], our jurisprudential approach in Wyoming would not pass muster before the Supreme Court of the United States." In order to bring Wyoming jurisprudence in line with *BMW,* the majority now requires that the jury be specifically instructed as to seven factors "adopted in *BMW* from [*Pacific Mut. Life Ins. Co. v.*] *Haslip* [499 U.S. 1, 111 S.Ct. 1032, 113 L.Ed.2d 1 (1991) ]."

The majority in *BMW* does not mention the *Haslip* seven factors, much less mandate that those factors be incorporated into jury instructions in order to satisfy due process requirements. The *BMW* concurring faction reviewed the seven factors used by the Alabama appellate court to determine whether the *BMW* jury award was grossly excessive. 517 U.S. at 589–92, 116 S.Ct. at 1606–07. In *Haslip,* the Court held that those factors imposed a sufficiently definite and meaningful constraint on the discretion of Alabama factfinders in awarding punitive damages. 499 U.S. at 22, 111 S.Ct. at 1045. However, the concurring justices in *BMW* concluded that while the factors, in principle, might make up for the lack of significant constraint on juries contained in the Alabama punitive damages statute,[1] the manner in which the Alabama courts had previously interpreted the standards and their application in the *BMW* case imposed little actual constraint. This hardly equates to a demand that state courts adopt the factors or hazard reversal of punitive damage awards in the United States Supreme Court (and indeed, that approach

---

**1.** The statute permits punitive damages in cases of "oppression, fraud, wantonness, or malice." Ala.Code. § 6–11–20(a) (1993).

certainly did not insulate the Alabama litigant in *BMW* ).

In addition, the discussions in both *Haslip* and the *BMW* concurrence speak of objective factors being used by the court in the course of *reviewing* a jury verdict as a means of imposing a meaningful constraint on the jury's decision, not as being included in instructions to the jury.[2] As a general proposition, I do not disagree that it may be appropriate to provide the jury with the more specific instructions articulated by the majority. However, I do disagree insofar as such a requirement is imposed on this case to render the jury award invalid. The jury was properly instructed as to Wyoming law; and, as the majority acknowledges, our existing law generally fits within the three guideposts utilized by the Supreme Court in *BMW*. *BMW* requires no more. Our task as the reviewing court is to make certain that the punitive damages are reasonable in their amount and rational in light of their purpose to punish what has occurred and to deter its repetition.

The facts in this case present a very different situation from those in *BMW*, and the award in this case withstands scrutiny under the three *BMW* guideposts: 1) degree of reprehensibility, 2) ratio of damages to harm, and 3) sanctions for comparable misconduct. Without undertaking a detailed analysis, I note that the record reflects a great deal of culpability on the part of the defendant here that was lacking in *BMW*: the jury heard testimony that it was common practice for the office staff to throw away medical bills submitted for payment to avoid the 45–day payment rule set forth in W.S. 26–15–124(a), and that this practice was instigated by the office manager. Whether or not this was the fate of the Shirleys' claims, clearly payment of their bills was delayed until a lawsuit was imminent. And while the ratio of punitive damages to harm is 234.375 to 1 and "must surely raise a suspicious judicial eyebrow," the Supreme Court has rejected a bright-line approach and acknowledged that higher ratios may be justified in cases in which a particularly egregious act has resulted in only a small amount of economic damages. In fact, in *TXO Production Corp. v. Alliance Resources Corp.*, 509 U.S. 443, 113 S.Ct. 2711, 125 L.Ed.2d 366 (1993), where the ratio was a "breathtaking 500 to 1," the Court upheld the award.

Punitive damages are often criticized because they are perceived as a windfall for plaintiffs and their lawyers, and some would argue that punitive damages be sharply limited or prohibited altogether. But punitive damages serve an important purpose—they punish defendants for reprehensible acts and deter such acts in the future. To limit or eliminate punitive damages gives defendants the ability to factor in a certain amount of wrongdoing (and the resulting punitive damage awards) as the cost of doing business. I would instead urge our legislature to consider a statutory enactment which would allocate a percentage of a punitive damage award to the plaintiff, with the remainder to be directed to the state. States have creatively directed revenue from similar statutory schemes to victims' assistance funds, legal services for low-income clients, to the state treasury, to their state university system, or to further the cause of the judiciary. *See BMW*, 517 U.S. at 614–19, 116 S.Ct. at 1618–20 (Appendix to Dissenting Opinion of Ginsburg, J.). In this way, punitive damages will continue to serve their worthwhile and justifiable purpose of punishing and deterring reprehensible behavior; wronged plaintiffs will still have adequate incentive to bring suits to hold wrongdoers accountable; and the benefit of the award will not represent a "windfall" to an individual plaintiff, but rather be appropriately utilized by the public as a whole.

---

2. The jury instructions reviewed by the *Haslip* court were found to be sufficient because they "described for the jury the purpose of punitive damages, namely, 'not to compensate the plaintiff for any injury' but 'to punish the defendant' and 'for the added purpose of protecting the public by [deterring] the defendant and others from doing such wrong in the future.'" *Haslip*, 499 U.S. at 19, 111 S.Ct. at 1044. The instructions "enlightened the jury as to the punitive damages' nature and purpose, identified the damages as punishment for civil wrongdoing of the kind involved, and explained that their imposition was not compulsory." Period.