**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**June 17, 2014**

**Elisabeth A. Shumaker**
**Clerk of Court**

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

MID-CONTINENT CASUALTY CO.,

Plaintiff-Appellee,

v.

CIRCLE S FEED STORE, LLC,
RICHARD L. MENUEY and MARY
L. MENUEY,

Defendants-Appellants.

and

I&W, INC.,

Defendant.

No. 13-2006

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW MEXICO**
**(D.C. NO. 2:11-CV-00329-WJ-LAM)**

---

Jennifer L. Collins (Robert J. Mroz with her on the briefs), Madison & Mroz,
P.A., Albuquerque, New Mexico, for Appellants.

Ken Slavin (Shelly W. Rivas, with him on the brief), Kemp Smith LLP, El Paso,
Texas, for Appellee.

---

Before **TYMKOVICH**, **SEYMOUR**, and **GORSUCH**, Circuit Judges.

---

**TYMKOVICH**, Circuit Judge.

I&W, Inc. owned a solution mining operation in Carlsbad, New Mexico. Its operations formed a cavern under its own property, which grew so large it infringed upon the subsurface property of the nearby Circle S Feed Store, LLC. This cavern, in turn, caused subsidence and damages to Circle S's surface property. A New Mexico state court found I&W negligent and liable for damages its solution mining operations caused to Circle S's property.

I&W sought indemnification for the damages under its commercial general liability (CGL) insurance policies, which had been issued by Mid-Continent Casualty Company. Mid-Continent, in turn, sought a declaratory judgment in federal court that it was not required to indemnify I&W for damages awarded in the state court action. The district court granted summary judgment for Mid-Continent, holding that a provision of the policies' Oil Industries Limitation Endorsement (Oil Endorsement) excluded coverage of the damages awarded in state court.

Exercising jurisdiction under 28 U.S.C. § 1291, we AFFIRM IN PART and REVERSE IN PART. We agree that the Oil Endorsement excludes coverage under the excess/umbrella policies issued to I&W, but we hold the Endorsement does not affect coverage under the primary policies.

## I. Background

Starting in 1995, I&W engaged in solution mining on its property in Carlsbad, New Mexico. Solution mining involves injecting fresh water into an underground salt formation to dissolve the salt for the creation of brine water. Brine water is then pumped from the formation and sold for use in the oil and gas industries. This process inevitably creates an underground cavern. As a regulated entity of the New Mexico Oil Conservation Division (NMOCD), I&W was required to monitor subsidence and ensure that its brine removal was not washing out salt from deep within the salt bed.

In 2008, the NMOCD required I&W to plug its last open well because the well posed a threat to "life and property." App. 58. I&W's operations caused an underground cavern to form under its own property and the adjacent property owned by Circle S, where Circle S operated its feed store, and caused subsidence and movement of Circle S's land. Circle S filed suit against I&W in state court, alleging negligence, negligent trespass, nuisance, withdrawal of lateral and subjacent support, interference with and interruption of enjoyment of property and operation of business, and unjust enrichment. Circle S alleged that I&W's actions caused damages to real property and structures and reduced the value of its property and business operations. At trial, experts testified that the cavern had increased in size over the years and the risk of the cavern collapsing was significant. Circle S also introduced evidence of the physical damages already caused to the structures located on its property. One expert opined that, as a

result of I&W's actions, the value of Circle S's property declined from $703,000 to zero. The jury ultimately found I&W 100% negligent and awarded Circle S compensatory damages of $703,000 and punitive damages of $300,000.[1]

From 2000 to 2009, Mid-Continent issued to I&W separate CGL primary insurance policies for successive twelve-month periods. Mid-Continent also issued five separate excess/umbrella policies to I&W for successive twelve-month periods from June 1, 2000 to June 1, 2005 that were distinct from the primary policies. The excess/umbrella policies provided coverage beyond what was covered in the primary policies and required I&W to maintain underlying primary insurance. The excess/umbrella policies also expressly incorporated the terms of a standard-form "Oil Industries Limitation Endorsement," which excluded coverage for damages caused by I&W's subsurface operations.

During the pendency of the state court litigation, Mid-Continent sought a declaratory judgment in federal court that it owed no duty to indemnify I&W under the insurance policies it issued to I&W between 2000 and 2009. Mid-Continent and Circle S both filed motions for summary judgment. The court rejected Mid-Continent's assertion that the damages to the Circle S property were not caused by an "occurrence" within the meaning of the policy. The district court also held that the policy's "intentional injury" exclusion did not apply.

_____

[1] I&W subsequently declared bankruptcy. Although I&W is joined in this case as a necessary party, the bankruptcy court gave Circle S the authority to control the litigation of this case.

Finally, the court concluded that the state court did not award damages for the property's diminution in value, a type of damages not covered by the policy. Nevertheless, the district court granted summary judgment for Mid-Continent because it concluded that the Oil Endorsement excluded damages caused by I&W's subsurface mining operations.

Circle S filed a motion to alter or amend the final judgment, asserting that the district court erred in holding that the Oil Endorsement applied to the primary policies issued to I&W and requesting the court to clarify its holding. The district court declined to reconsider its holding, but declared that it would have found coverage but for the language in the Oil Endorsement. This appeal followed.

## II. Analysis

Circle S argues for reversal on the grounds that the Oil Endorsement does not apply to the primary policies. Mid-Continent asks us to affirm the grant of its motion for summary judgment, noting that we may adopt alternate grounds for excluding coverage that the district court rejected. We agree with Circle S that the primary policies cover its damages, as we explain further below.

We review a grant of summary judgment de novo. *See Timmons v. White*, 314 F.3d 1229, 1232 (10th Cir. 2003). Because this is a diversity case, we ascertain and apply state law—in this case, New Mexico law. *See McIntosh v. Scottsdale Ins. Co.*, 992 F.2d 251, 253 (10th Cir. 1993). Under New Mexico law, the construction of an insurance policy is a legal question that is reviewed de

-5-

novo.  *See United Nuclear Corp. v. Allstate Ins. Co.*, 285 P.3d 644, 647 (N.M. 2012).

We first explain why the Oil Endorsement exclusion does not apply to the primary policies.  We then explain why the subsidence was a covered "occurrence" under the primary policies and that the state court's damages calculation reasonably covers the physical damage to Circle S's property.  We conclude the district court erred in granting summary judgment for Mid-Continent.

## A.  *Application of Oil Endorsement Exclusion*

I&W purchased CGL policies from Mid-Continent to cover its general business operations.  In addition to the primary policies, I&W purchased additional coverage in the form of excess/umbrella policies.  As a part of this additional coverage, I&W and Mid-Continent agreed to an exclusion for damages arising from I&W's subsurface operations, the so-called "Oil Industries Limitation Endorsement."  The Oil Endorsement, labeled Endorsement MU6057, operates to exclude coverage for damages caused by subsurface mining.  Specifically, the Oil Endorsement states,

> It is agreed that this insurance does not apply to:
> 1. . . . .
> 2. *Loss of, damage to, or loss of use of property directly or indirectly resulting from subsidence caused by subsurface operations of the Insured.*
> 3. Removal of, loss of, or damage to subsurface oil, gas or any other substance, the property of others.

-6-

App. 574 (emphasis added). The district court reasoned that subsection A.2 clearly applied to exclude the damages to Circle S's property caused by I&W's solution mining operations. The court applied the Oil Endorsement to exclude all coverage under the primary and excess/umbrella policies, even though Mid-Continent did not argue for such a broad exclusion before the district court.

Circle S argues that the Oil Endorsement does not exclude coverage under the primary policies because the primary policies do not incorporate the Oil Endorsement. We agree.

The primary policies and excess/umbrella policies issued to I&W are distinct sets of policies, serve different purposes, and incorporate different forms and endorsements. An excess policy provides secondary coverage only after the primary coverage limits have been exhausted. An umbrella policy, meanwhile, "provide[s] primary coverage for risks that the underlying policy does not cover." 15 Steven Plitt et al., *Couch on Insurance* § 220:32 (3d ed. 2013). The term "umbrella" does not mean that every one of the umbrella policy's terms is applicable to an underlying primary policy—the umbrella policy is a separate and distinct policy. *See Commercial Union Ins. Co. v. Walbrook Ins. Co.*, 7 F.3d 1047, 1053 (1st Cir. 1993) ("Umbrella policies differ from standard excess insurance policies in that they are designed to fill gaps in coverage both vertically (by providing excess coverage) and horizontally (by providing primary

-7-

coverage).”).  Because excess and umbrella policies are distinct from underlying primary policies, their endorsements are not automatically incorporated into and do not affect the terms of the primary policies.  *Cf. Empire Fire & Marine Ins. Co. v. Guaranty Nat'l Ins. Co.*, 868 F.2d 357, 363 (10th Cir. 1989) (declining to apply one policy's endorsement to other policies because the endorsement does not “purport to limit or delete clauses in other policies”), *overruled on other grounds by Carolina Cas. Ins. Co. v. Yeates*, 584 F.3d 868 (10th Cir. 2009).

Mid-Continent issued excess/umbrella policies to I&W that contain policy numbers distinct from the primary policies and for which Mid-Continent collected separate premiums.  And each of the excess/umbrella policies issued to I&W incorporates the Oil Endorsement into its terms.  The primary policies, however, list several forms and endorsements incorporated into the policies; none of them contain Endorsement MU6057.  Because the express terms of the policies limit the application of the Oil Endorsement to the excess/umbrella policies, the district court erred in concluding that the Oil Endorsement applied to exclude all coverage under the primary policies.[2]

---

[2]  Mid-Continent does not attempt to argue that the Oil Endorsement excludes coverage under the primary policies, and conceded as much at oral argument.  Instead, it asserts Circle S cannot make the argument on appeal because Circle S did not argue against the Endorsement's applicability in the district court.  But Circle S had no opportunity to raise this issue to the court because Mid-Continent did not address it in its motion for summary judgment and the district court ruled on it *sua sponte*.  Because Circle S was not on notice that it would have to argue against the applicability of the Endorsement to the primary
(continued...)

Circle S also asks us to find the Oil Endorsement does not exclude coverage under the excess/umbrella policies, even though these policies incorporate the Oil Endorsement. Circle S contends the district court erred in its interpretation of subsection A.2 to exclude coverage for solution mining because the provisions of the Oil Endorsement are ambiguous, in that they seemingly apply only to subsurface operations related to oil and gas extraction, rather than to solution mining. It argues the ambiguity should be construed against the insurer. *See United Nuclear*, 285 P.3d at 648.

We agree with the district court that the plain language of the Oil Endorsement is not ambiguous and expressly applies to I&W's solution mining operations. The specific language, "*subsurface operations of the Insured*," plainly applies to I&W's business and thus excludes coverage for damages to Circle S's property under the excess/umbrella policies.

In sum, the district court should not have applied the Oil Endorsement to exclude primary coverage for damages caused by I&W's solution mining operations. But the Oil Endorsement does exclude coverage under the excess/umbrella policies.

---

[2](...continued)
policies, the argument is not considered waived. *See Kannady v. City of Kiowa*, 590 F.3d 1161, 1170–71 (10th Cir. 2010).

### B. Other Contract Provisions

Since we conclude the Oil Endorsement does not bar coverage under the primary policies, we must consider the district court's resolution of the remaining issues. In its order, the district court stated that, but for the Oil Endorsement, it would have found coverage for the damages caused to Circle S's property, in three steps: (1) the subsidence I&W caused was an "occurrence" within the meaning of the policies; (2) the policies' "intentional injury" exclusion did not apply to exclude coverage; and (3) the damages awarded to Circle S were for a "physical injury to tangible property," which is covered, rather than for pure diminution in value, which is not.

We address each in turn.

### 1. "Occurrence"

Mid-Continent argues the district court was incorrect to conclude that the damage caused by the underground cavern and subsidence was an "occurrence" within the meaning of the primary policies.

CGL policies provide coverage for the insured's "tort liability for physical injury to the person or property of others," but not for the insured's "contractual liability which merely causes economic losses." 9A Steven Plitt et al., *Couch on Insurance* § 129:4 (3d ed. 2013). They "are intended to provide coverage only for events which are fortuitous, unforeseeable events, and not for the foreseeable results of an insured's deliberate conduct . . . ." *Id.*

The primary policies issued to I&W require coverage for "property damage" caused by an "occurrence" within the coverage territory. The policies define an occurrence as an "accident, including continuous or repeated exposure to substantially the same general harmful conditions." App. 318. Because the policies do not define "accident," we look to state law to define this term. *Employers Mut. Cas. Co. v. Bartile Roofs, Inc.*, 618 F.3d 1153, 1173 (10th Cir. 2010). Under New Mexico law, the term "accident" in an insurance policy "expresses the thought of an event occurring without design or purpose, or unintentionally on the part of the [insured]. Given the latter meaning, it does not negative the idea of negligence on the part of one whose physical act the occurrence follows." *King v. Travelers Ins. Co.*, 505 P.2d 1226, 1229 (N.M. 1973) (internal quotation marks and citation omitted). It is "an unexpected, unforeseen, or undesigned happening or consequence from either a known or an unknown cause." *Vihstadt v. Travelers Ins. Co.*, 709 P.2d 187, 188 (N.M. 1985) (quoting *King*, 505 P.2d at 1229–30).

Mid-Continent argues that there was no "occurrence" under the policies because I&W deliberately created the underground cavern that damaged Circle S's property through intentional conduct. According to Mid-Continent's interpretation of what constitutes an "occurrence," the relevant question is whether the *act* giving rise to the harm was deliberate, rather than whether the resulting *injury* was deliberate. Mid-Continent maintains that, because the

-11-

removal of brine water, whether done correctly or negligently, inevitably results in an underground cavity, I&W's intentional removal of brine water and knowledge of the resulting cavity are enough to establish deliberateness. *See Greystone Constr., Inc. v. Nat'l Fire & Marine Ins. Co.*, 661 F.3d 1272, 1283 (10th Cir. 2011) ("[A] deliberate act, performed negligently, is an accident if the effect is not the intended or expected result; that is, the result would have been different had the deliberate act been performed correctly."). Mid-Continent urges us to adopt a "natural and probable consequences" approach to the definition of accident. This approach typically excludes coverage for injuries resulting from the negligent acts of the insured. *See, e.g.*, *Bartile Roofs*, 618 F.3d at 1174 (interpreting Utah and Wyoming law).

But under the majority approach, the insured's act is not accidental only if the insured "intended both the act *and* to cause some kind of injury or damage. Intent to cause the injury or damage can be actual or it can be inferred from the nature of the act when the consequences are substantially certain to result from the act." *Thomas v. Benchmark Ins. Co.*, 179 P.3d 421, 431 (Kan. 2008); *see also Greystone*, 661 F.3d at 1285 ("[T]he term 'occurrence' excludes from coverage only those damages that the insured knew would flow directly and immediately from its intentional act." (internal quotation marks omitted) (interpreting Colorado law)); *Sena v. Travelers Ins. Co.*, 801 F. Supp. 471, 476 (D.N.M. 1992) (holding the injury must be the "direct, natural result" of an "inherently harmful"

-12-

act for a court to find the injury outside the scope of coverage (citing *Vihstadt*,

709 P.2d at 189)); Robert H. Jerry & Douglas R. Richmond, *Understanding*

*Insurance Law* § 63C(b) (5th ed. 2012) (describing that a majority of jurisdictions

require an intent to act and to cause some kind of injury for the damage to be

excluded); Eric Mills Holmes, *Appleman on Insurance* 2d (archive file) § 117.4

("For purposes of determining whether recovery can be had under an 'accident'

provision of a liability policy, the resulting damage can be unintentional and

therefore accidental even though the original acts were intentional."); *id.* ("The

majority insurance rule is that loss resulting from ordinary negligence of an

insured or the insured's agent may be considered as injury or damage caused by

'accident' . . . .").

The New Mexico Supreme Court endorsed the majority approach in the

context of defining an "intentional injury" exclusion. *Knowles v. United Servs.*

*Auto. Ass'n*, 832 P.2d 394, 397 (N.M. 1992).[3]  The court held that the insurance

policy at issue, which excluded "damage expected or intended" by the insured,

"excludes harm of the same general type as the insured intended." *Id.*  The court

reasoned that this approach "balances the policy of construing ambiguous clauses

---

[3]  The inquiry into whether an injury is accidental informs the court's determinations as to whether an "occurrence" is present and whether the "intentional injury" exclusion applies. *See Hartford Fire Ins. Co. v. Gandy Dancer, LLC*, 864 F. Supp. 2d 1157, 1197 n.13 (D.N.M. 2012), *other grounds reconsidered in* CIV 10-0137 JB/RHS, 2013 WL 5934489 (D.N.M. Aug. 30, 2013).

in favor of the insured against an insurance company's right to not insure against harm deliberately caused by the insured." *Id.* at 397–98. The court explicitly rejected the "natural and probable consequences" approach to determining whether an injury is intended. *See id.* at 397.

Based on this legal framework, the damages I&W's negligence caused to Circle S's property are within the scope of coverage of the primary policies because I&W neither intended the injuries to Circle S's property nor knew that injuries were likely to result. No evidence in the record suggests I&W knew that damages to Circle S's property "would flow directly and immediately from its intentional act." *Greystone*, 661 F.3d at 1285. To the contrary, the record discloses I&W was not aware that its underground cavern had grown dangerously large or that the cavern infringed upon Circle S's subsurface property. All solution mining causes an underground cavern to form, but it is not true that subsidence or damages to an adjoining property and its surface structures are "substantially certain to result from" all solution mining operations. *Thomas*, 179 P.3d at 431. Generalized knowledge that solution mining causes cavern growth is not enough to establish constructive intent. Without evidence of I&W having actual or constructive intent to cause a dangerously large cavern to form in the course of its solution mining operations, we must conclude that the damages were caused by an "occurrence" within the meaning of the primary policies.

The rule Mid-Continent has presented to us would swallow the insurance. Every harm flowing from intentional acts, whether driving a tractor or drilling a well, would not be covered because the tortfeasor intended to drive the tractor or drill the well. This narrow scope of coverage is inconsistent with New Mexico law. *See, e.g.*, *King*, 505 P.2d at 1229 ("[A]n insurance policy designed to compensate for damages suffered by 'accidental means' is no less effective when the damages result from negligence.").

In support of its position that the relevant inquiry is whether the insured's act was deliberate, Mid-Continent points to *Red Ball Leasing, Inc. v. Hartford Accident & Indem. Co.*, 915 F.2d 306 (7th Cir. 1990). In *Red Ball*, the Seventh Circuit held that the insured's intentional repossession of trucks to which it believed it held a right of repossession did not constitute an "occurrence" under the policy. The insured had argued that, because it believed it had the right to repossession, its tortious conversion of the trucks was accidental. The court disagreed, concluding that the resulting damage of the insured's act— repossession of the trucks—was intentional. Even though the insured's negligence in its accounting procedures caused it to seek repossession of the trucks, the court held that, "whether prompted by negligence or malice, (1) appellant's acts were committed consciously and deliberately, without the unexpected intervention of any third force, and (2) the likely (and actual) effect of those acts was well within appellant's foresight and anticipation." *Id.* at 310

-15-

(internal quotation marks omitted). That the insured was unaware of the legal consequences of its volitional act was not material.

Unlike the insured in *Red Ball*, the result of I&W's solution mining was not "well within" I&W's "foresight and anticipation." I&W intended to conduct solution mining in its subsurface property and anticipated that an underground cavern would form. But the resulting damage—infringement on Circle S's subsurface property, subsidence, and damage to surface structures—was not the anticipated result. There is no allegation that I&W intentionally infringed upon Circle S's property under a mistaken belief that it had a right to do so. The infringement was accidental and the result of I&W's negligence.

The district court correctly concluded that the damages to Circle S's property were caused by an "occurrence" and are thus covered under the primary policies.

### 2. *"Intentional Injury" Exclusion*

Mid-Continent next argues that the "intentional injury" exclusion applies to exclude coverage under the policies.

The primary policies issued to I&W exclude from coverage "intentional injuries" caused by the insured. As an initial matter, the legal framework for determining whether an "occurrence" is present also controls whether a CGL policy's "intentional injury" exclusion applies. As explained above, New Mexico construes an "intentional injury" provision "to exclude harm of the same general

-16-

type as intended by the insured." *Knowles*, 832 P.2d at 398. In *Knowles*, the court held that the exclusion applied because the insured erected a gate on a road across his property with the intent to exclude others from accessing the road. This interfered with another individual's right to access an easement, and this individual sued for wrongful eviction. Even though the insured did not intend to commit the intentional tort of wrongful eviction, the court applied the "intentional injury" exclusion because the harm alleged in the complaint was of the same general type expected or intended by the insured in erecting the gate.

But here, as we have described, the harm caused to Circle S was not expected or intended by I&W. There is no evidence to conclude that I&W expected or intended the underground cavern to grow dangerously large or infringe upon Circle S's property. The district court was correct to hold the "intentional injury" exclusion does not apply.

### 3. Diminution in Value Damages

Lastly, Mid-Continent argues that the district court erred in finding the damages awarded to Circle S were for "property damage" within the meaning of the policies. The company contends that the damages awarded were for the diminution in value of Circle S's property. Because diminution in value is not "property damage" within the meaning of the policies, Mid-Continent contends, the court erred in finding coverage for these damages. We disagree.

-17-

Like all standard CGL policies, the primary policies at issue in this case cover "*damages because of . . . 'property damage'* to which this insurance applies." App. 305 (emphasis added). The policy defines "property damage" as "physical injury to tangible property, including all resulting loss of use of that property." *Id.* at 319. Under a CGL policy, intangible losses, such as diminution in value, do not constitute "property damage" within the meaning of the policy. *See Hartford Accident & Indem. Co. v. Pac. Mut. Life Ins. Co.*, 861 F.2d 250, 254 (10th Cir. 1988); *see also Goodstein v. Cont'l Cas. Co.*, 509 F.3d 1042, 1054 (9th Cir. 2007) ("[D]iminution in value does not alone constitute 'property damage' where the policy language requires 'physical injury to tangible property.'").[4]

Damages that result from "property damage" within the meaning of a CGL policy may be measured according to the diminution in value of the property, as long as the diminution in value is attributable to the covered damage. *See, e.g.*, *Mid-Continent Cas. Co. v. Acad. Dev., Inc.*, 476 F. App'x 316, 319 (5th Cir. 2012) ("A damages because of . . . 'property damage' provision in a CGL policy includes recovery sought for economic losses, such as diminution in value, that are 'attributable' to property damage."); *Helm v. Bd. of Cnty. Comm'rs, Teton*

---

[4] Before revisions to the standard CGL policy form in 1973, CGL policies typically covered losses for diminution in value as an "injury . . . to property." The revisions made in 1973 limited coverage to *physical* injury to or loss of use of tangible property. *See Hartford*, 861 F.2d at 254 ("The definition of property damage incorporated into the standard CGLP form by the 1973 revision and found in the umbrella policy here, was intended to preclude coverage for intangible injuries such as diminution in value.").

*Cnty.*, 989 P.2d 1273, 1276 (Wyo. 1999) ("[T]he diminution in value stems directly from the damage to the property occasioned by the builders' installation of a defect and/or from the loss of use of the property. This injury falls squarely within the plain language of the insurance policy exclusion."); 9 Steven Plitt et al., *Couch on Insurance* § 126:38 (3d ed. 2013) ("There are two views regarding whether the diminution in value of tangible property constitutes property damage. One view holds that such damages are compensable only when they are the result of physical damage. . . . Other courts hold to the view that the diminution of value of tangible property constitutes 'property damage' in and of itself."); Jeffrey E. Thomas, *New Appleman on Insurance Law* § 18.02 ("Because the insuring agreement refers to liability imposed 'because of . . . property damage,' an economic loss that causally follows from a direct physical injury to tangible property or a loss of use of tangible property is within the coverage of the CGL.").

Mid-Continent points to our decision in *Hartford* as contrary authority. There, a sub-contractor installed a defective exterior wall system in a building. The system failed, causing physical damage to parts of the building and requiring the building owner to undertake a major restoration project and replace parts of the system. The district court had to construe two separate policies: a pre-1973 primary policy and an excess/umbrella policy incorporating the 1973 revisions. The district court concluded, with respect to the primary policy, that the correct

-19-

measure of damages that a defective integral part of a building caused to the whole is the lesser of the diminution in market value of the building or the costs of restoration plus losses for deprivation of use. *Hartford*, 861 F.2d at 252.

We disagreed, holding that, because the primary policy excluded coverage for repair or replacement of a faulty work product but permitted recovery of diminution in value damages, the correct measure of damages was the diminution in value minus the costs of restoration of the wall system. *Id.* at 254. But, because the excess/umbrella policy incorporated the 1973 revisions, the excess/umbrella policy did not cover damages for the diminution in value of the building. *Id.* Finally, we concluded the policies did not cover any consequential damages because the policies provided coverage only for damages caused by "property damage *to which this insurance applies*." *Id.* at 254–55 (emphasis in original). Because the insured's defective work product was not property damage to which the insurance applied, any consequential damages were not covered.

Mid-Continent asks us to read our decision in *Hartford* to exclude coverage for diminution in value arising out of a covered "physical injury to tangible property" because we found no coverage for diminution in value of the building even though there was accompanying physical damage. *See* Scott Turner, *Insurance Coverage of Construction Disputes* § 6:28 (2d ed.) (commenting on *Hartford* and other similar cases) ("After the physical injury qualification was added in the 1973 revision of the standard policies, a few courts held that

diminution in value did not satisfy the 'physical injury to the real property' requirement. That analysis misses the point. The physical injury under this approach is not the diminution in value itself. Diminution in value is only the measure of damages.").

Such a broad reading of *Hartford*, however, is unwarranted. In *Hartford*, we found no underlying "property damage" within the meaning of the excess/umbrella policy, which incorporated the 1973 revisions. Although there was physical damage to other parts of the building, as we explained above, those damages were not covered because they did not derive from "property damage to which the insurance applie[d]." *Hartford*, 861 F.2d at 255. Consequently, there was no "property damage" from which diminution in value damages could have arisen. We declined coverage under the excess/umbrella policy at issue in *Hartford* because the damages were pure diminution in value damages, unconnected to any form of covered "property damage." *See* 46 C.J.S. *Insurance* § 1406 ("While a diminution in the value of property caused by insured's faulty workmanship does not constitute property damage, a diminution in the value of property caused by physical damage to the property constitutes property damage."); *New Hampshire Ins. Co. v. Vieira*, 930 F.2d 696, 701 (9th Cir. 1991) ("Diminution in value and cost of repair are not two separate harms—they are two different ways of measuring the same harm."). Therefore, we cannot read

*Hartford* to exclude coverage for diminution in value that arises from covered property damage.

In the underlying lawsuit in this case, the state trial court awarded damages for the diminution in value of Circle S's property caused by physical injury to the property. The judge instructed the jury that, if it found damages were appropriate, the proper measure of damages was the difference in value of Circle S's property before and after the subsidence occurred, since the property had little or no resale value for surface operations. The figure awarded, $703,000, matches the figure an expert testified was the diminution in market value of the property. But the figure awarded reasonably measures the damages arising out of the physical injury to the property.

In sum, we conclude that the district court was correct: the primary policies cover the damages awarded to Circle S. The loss of value of Circle S's property stemmed directly from a physical injury to Circle S's real property. It is uncontested the subsidence and cavern growth in Circle S's subsurface property qualifies as a physical injury to Circle S's property. This physical injury resulted in a danger of collapse of Circle S's property, which renders the property completely valueless. Under these circumstances, diminution in value damages constitute "damages because of . . . 'property damage' to which this insurance applies." App. 305.

# III.  Conclusion

In sum, we AFFIRM IN PART and REVERSE IN PART.  We agree with the district court that the Oil Endorsement excludes coverage under the excess/umbrella policies.  But we hold that the Oil Endorsement does not exclude coverage that otherwise exists under the primary policies.  We REVERSE the district court's ruling that Circle S's cross-motion for summary judgment and Mid-Continent's motion on punitive damages were moot.  We REMAND for further proceedings consistent with this opinion.