**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**April 30, 2024**

**Christopher M. Wolpert**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

SADDLETREE HOLDING, LLC,

    Plaintiff - Appellant,

v.

EVANSTON INSURANCE COMPANY;
MARKEL SERVICE, INC.,

    Defendants - Appellees.

No. 23-8024
(D.C. No. 2:22-CV-00089-NDF)
(D. Wyo.)

_____

**ORDER AND JUDGMENT**[*]
_____

Before **TYMKOVICH**, **MATHESON**, and **BACHARACH**, Circuit Judges.
_____

This appeal arises from Evanston Insurance Company and Markel Service Incorporated's denial of insurance coverage for damages sustained to Saddletree Holding LLC's building in eastern Wyoming.  Saddletree subsequently brought three claims against Evanston and Markel: (1) breach of contract, (2) substantive bad faith, and (3) procedural bad faith.  Following discovery, the parties cross moved for summary judgment as to all asserted claims.

---

[*] This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel.  It may be cited, however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

The district court entered judgment in favor of Evanston and Markel and dismissed the case with prejudice.  Saddletree appealed.  Because we agree the insurance defendants were entitled to summary judgment, we affirm.

## I.  Background

For purpose of this appeal, all inferences are construed in the light most favorable to Saddletree based on the summary judgment record developed in the district court.

On May 7, 2019, Saddletree filed an insurance claim for damages sustained to its building located in Upton, Wyoming (the Building).  Aplt. Br. 11.  The Building was used as a community events center.  Following a winter of heavy snowfall, Saddletree discovered that the Building's steel support columns had buckled two or more inches and the roof had deflected downward approximately six inches.  The Building was insured by Evanston; Markel was the claims processor.

During claims processing, Defendants retained an engineer who inspected the Building.  Defendants' engineer determined that the damage was the result of the Building's inadequate "design[] and/or construct[ion]."  App. 701.  Evanston disclaimed coverage pursuant to a Policy exclusion precluding damage caused by "hidden or latent defect[s]" or "any quality in property that causes it to damage or destroy itself."  *Id*. at 746–48 (Because "the loss sustained to your building was caused by improper design and construction we unfortunately are unable to consider this claim[.]").

Saddletree did not contemporaneously contest the denial.  Instead, it sued its builder, Dreams Carports & Buildings, Inc.  To support that suit, Saddletree requested Defendants turn over their engineering report.  They declined.  So Saddletree retained its

2

own engineer, who "determined that the original design is deficient[.]" App. 849. Saddletree's engineer also noted "[i]t is very fortunate the structure *has not collapsed* based on the levels of deficiencies determined." *Id.* (emphasis added). On March 23, 2021, the district court entered default judgment against Dreams and awarded Saddletree over $2.2 million in damages, a judgment that Saddletree is still attempting to collect.

On July 8, 2021—more than two years after Saddletree filed its insurance claim— Saddletree's new counsel wrote to Defendants, again requesting that they turn over their engineering report. Defendants disclosed the report on August 10, 2021. Around two months later, Saddletree wrote to Defendants demanding that Evanston reverse its coverage denial pursuant to, among other things, the Policy's "Collapse" provision. Aplt. Br. 15. Defendants responded that the Policy did not provide coverage under that provision because the Building had not collapsed. App. 853–55.

Between January 16, 2022, and March 17, 2022, the parties each commissioned supplemental engineering reports addressing the cause and nature of the damage. Unsurprisingly, Saddletree's supplemental report supported its theory that the Building had abruptly collapsed (so as to arguably permit coverage) and Defendants' did not. Relying on their supplemental engineering report, Defendants again disclaimed coverage. Shortly thereafter, Saddletree sued Defendants for breach of contract and substantive and procedural bad faith.

The district court entered summary judgment for Defendants on all Saddletree's asserted claims. It first determined that the breach of contract claim was barred by the Policy's two-year contractual limitations period. Second, it determined that the parties'

dueling expert reports rendered Defendants' coverage denial "fairly debatable"—precluding Saddletree's claim for substantive bad faith. Finally, because Saddletree proffered no evidence of recoverable economic damages, it determined that Saddletree could not sustain its procedural bad faith claim. So finding, it dismissed the case with prejudice.

Saddletree timely appealed, and we affirm.

## II. Analysis

On denials of summary judgment, we "review the district court's factual findings for clear error and its legal conclusions de novo." *La Resolana Architects, PA v. Reno, Inc.*, 555 F.3d 1171, 1177 (10th Cir. 2009); *Packard v. Budaj*, 86 F.4th 859, 864 (10th Cir. 2023). "Findings of fact are clearly erroneous when they are unsupported in the record, or if after our review of the record we have the definite and firm conviction that a mistake has been made." *TransWestern Pub. Co. LP v. Multimedia Mktg. Assocs., Inc.*, 133 F.3d 773, 775 (10th Cir. 1998) (internal citations omitted).

Wyoming substantive law applies to all Saddletree's claims. *Mid-Continent Cas. Co. v. Circle S Feed Store, LLC*, 754 F.3d 1175, 1178 (10th Cir. 2014).

### A. *Breach of Contract*

Saddletree does not dispute that its breach claim falls outside the Policy's two-year limitations period.[1]  Instead, it argues Defendants were either estopped from raising the limitations defense or waived it.  We disagree.

### 1. *Estoppel*

Saddletree first argues Defendants should be estopped from relying on the Policy's limitations period.  In Wyoming, an insurer "is estopped when the [claimant] is deceived; the deception occurs when the [claimant] is lulled into a false sense of security."  *Cornhusker Cas. Co. v. Skaj*, 786 F.3d 842, 855 (10th Cir. 2015) (internal quotations omitted).

Saddletree argues Defendants lulled it into inaction by failing to disclose the engineering report until *after* the Policy's limitations period ran.  The necessary implication—though Saddletree never directly states as much—is that it would have sued Defendants *within* the limitations period had it received the report sooner.

Saddletree's argument fails for several reasons.  First, it is directly contradicted by the record:  Saddletree testified it had "no idea" what it would have done differently had it received Defendants' engineering report sooner.  App. 1015.  That makes sense, since its own report provided all the information it needed to

---

[1] Contractual limitations periods "are prima facie valid and will be enforced absent a demonstration by the party opposing enforcement that the clause is unreasonable or based upon fraud or unequal bargaining positions." *Nuhome Invs., LLC v. Weller*, 81 P.3d 940, 947 (Wyo. 2003).  Saddletree identifies no evidence demonstrating that the Policy's two-year limitations period was unreasonable, based upon fraud, or the result of unequal bargaining positions.

pursue its collapse theory against Defendants *within* the limitations period. *See, e.g.*, *id.* at 849 ("All the frames are likely damaged including: i. Buckled vertical members at exterior walls [and] ii. Overloaded truss members throughout the framework[.])"; *id.* at 847 (discussing the "permanently deflected shape of the roof . . . ."). Saddletree presents no argument or facts indicating that something in the Defendants' engineering report would have prompted it to sue Defendants within the limitations period.[2]

Second, Saddletree has not identified any authority indicating Defendants had a duty to provide their engineering report. Saddletree's only support for this proposition is an alleged conversation between its former counsel and an unnamed individual at the Wyoming Department of Insurance. Aplt. Br. 12. But this bare, unsupported assertion is insufficient to preclude summary judgment. *See Hall v. Bellmon*, 935 F.2d 1106, 1111 (10th Cir. 1991) ("[C]onclusory and self-serving affidavits are not sufficient" to defeat summary judgment.).

---

[2] It also makes sense that Saddletree did not sue Defendants until *after* it failed to collect against Dreams because its own expert report confirms Defendants' basis for denying coverage pursuant to the Policy's faulty design and construction exclusion. App. 586 ("We will not pay for loss or damage caused by or resulting from . . . [f]aulty, inadequate or defective . . . (2) Design, specifications, workmanship, repair, construction, renovation, remodeling, grading, compaction[.]"); *id.* at 848 ("[i]t appears unlikely that the original structure was designed by a qualified engineer . . . [t]he design is so terribly overloaded that it suggests no person with a technical knowledge of the structural design of light gage members was involved in the original design or construction.").

6

Absent an affirmative duty to provide the report, Defendants did not act inappropriately in refusing to provide it, and that refusal did not lead to estoppel.[3]

### 2. Waiver

Saddletree next argues that Defendants waived their ability to assert the Policy's limitations period. Saddletree has not preserved this argument for appellate review, so we need not address it. App. 920–21 (merely arguing estoppel to the district court); *United States v. Leffler*, 942 F.3d 1192, 1196 (10th Cir. 2019) ("When a party fails to raise an argument below, we typically treat the argument as forfeited.").

But even if we did reach it, we would conclude that Defendants did not waive their reliance on the Policy's limitations period. Saddletree, citing *Cornhusker*, asserts that "an insurer's conduct of not timely disclaiming coverage, and standing by silently and acquiescing in the insured's conduct in contravention of a policy exclusionary provision will be held to have waived the terms of the policy." Aplt. Br. 31.

---

[3] Saddletree also argues Defendants are estopped from relying on the limitation provision because they engaged in post-deadline claims communication and handling regarding the Building's "collapse" without raising the limitations period. Aple. Br. 25–30. But the limitations period only bars plaintiffs from suing—not from continuing to pursue a claim for benefits. App. 581 ("No one may bring a legal action against us under this Coverage Part unless . . . [t]he action is brought within two years after the date on which the direct physical loss or damage occurred."). Defendants' continued claim processing after the suit-filing deadline does not preclude their later reliance on the limitations period.

Saddletree overreads *Cornhusker*. The portion of *Cornhusker* Saddletree cites states:

> a liability insurance carrier, *which assumes and conducts the defense of an action* . . . with knowledge of a ground of forfeiture or noncoverage under the policy, and without disclaiming liability or giving notice of a reservation of its right to deny coverage, is thereafter precluded in an action upon the policy from setting up the ground of forfeiture or noncoverage as a defense. In other words, *the insurer's unconditional defense of an action* . . . constitutes a waiver of the terms of the policy and an estoppel of the insurer to assert the defense of noncoverage . . . . [I]t is not necessary for the [defended party] to show prejudice in such a situation because he is presumed to have been prejudiced by virtue of the insurer's *assumption of the defense*.

786 F.3d at 852–53 (citing *New Jersey Fid. & Plate Glass Ins. Co. v. McGillis*, 42 F.2d 789, 791 (10th Cir. 1930)) (emphasis added).

*Cornhusker* stands for the proposition that an insurer cannot assume the unconditional defense of an insured—despite knowing of a basis for noncoverage— only to later assert noncoverage under the policy. The core principle is that an insurer cannot "lull" an insured into thinking its claim is being defended, only to later deny coverage once the limitations clock to sue the insurer has run. *Id.* at 852–53, 855. But that is not what happened here. Defendants never assumed Saddletree's defense or otherwise indicated they would provide coverage. They denied coverage from the beginning.

Saddletree, moreover, has proffered no evidence that Defendants were aware of and disregarded its "abrupt collapse" theory as a basis for coverage when making their initial denial. Indeed, Saddletree did not raise this coverage theory until *after*

8

the 24-month limitations period had run. *See Rogers v. Wright*, 366 P.3d 1264, 1277–78 (Wyo. 2016) (waiver requires the waiving party intentionally relinquish a known right). Saddletree did not even make a second request for Defendants' engineering report until 29 months *after* the reported date of loss—which, perhaps coincidentally—was after Saddletree learned Dreams was judgment proof. And Saddletree did not ask Defendants to provide coverage under the Policy's collapse provision until 33 months after the reported date of loss. Once it did, Defendants timely considered and reasonably rejected Saddletree's claim. *See infra* (II)(B).

* * *

Defendants are entitled to rely on the Policy's two-year limitations period. Because the undisputed facts demonstrate Saddletree's breach claim is barred by the limitations period, the district court correctly entered summary judgment for Defendants.[4]

### B. Substantive Bad Faith

Saddletree next argues the district court erred by granting summary judgment in Defendants' favor on its substantive bad faith claim.

"The test used in determining whether a claim was denied in bad faith is an objective one which questions whether the validity of the denied claim was not fairly

---

[4] Because we conclude the district court properly entered summary judgment in Defendants' favor, we do not reach Saddletree's argument that it is entitled to an entry of summary judgment for breach of contract under the Policy's abrupt collapse provision. *Singleton v. Wulff*, 428 U.S. 106, 120 (1976) ("It is the general rule, of course, that a federal appellate court does not consider an issue not passed upon below.").

debatable." *State Farm Mut. Auto. Ins. Co. v. Shrader*, 882 P.2d 813, 825 (Wyo. 1994). "A claim [is] fairly debatable when a reasonable insurer would have denied or delayed payment of benefits under the facts and circumstances." *Ahrenholtz v. Time Ins. Co.*, 968 P.2d 946, 950 (Wyo. 1998) (citing *McCullough v. Golden Rule Ins. Co.*, 789 P.2d 855, 860 (Wyo. 1990)).

"[I]f a realistic question of liability does exist, the insurance carrier is entitled to reasonably pursue that debate without exposure to a claim of violation of its duty of good faith and fair dealing." *Hatch v. State Farm Fire & Cas. Co.*, 842 P.2d 1089, 1093 (Wyo. 1992) (citing *McCullough*, 789 P.2d at 860). In pursing that debate, an insurer "is entitled to rely on the conclusion of [] independent experts . . . unless there is a showing that there was collusion between the experts and [the insurer] or that the experts knowingly made false reports." *Id.* "Conflicting opinions among experts regarding the cause of the [loss] is not a factual dispute and does not preclude granting a summary judgment on the issue of 'fairly debatable defense.'" *Id.* at 1094.

Saddletree argues the "denial of the claim was not fairly debatable" since "Markel knew of, or recklessly disregarded the [abrupt collapse] coverage from and after its initial July 27, 2019, denial of coverage." Aplt. Br. 43. The Policy does not define the term "collapse," but it does state that abrupt collapse coverage

> does not apply to . . . (a) A building . . . that is in danger of falling down or caving in; (b) A part of a building that is still standing, even if it has separated from another part of the building; or (c) A building that is standing or any part of a building that is standing, even if it shows evidence of cracking, bulging, sagging, bending, leaning, settling, shrinkage or expansion.

10

App. 589.[5]

This is what the Building looked like on June 6, 2019—a month after Saddletree filed its insurance claim:

 

*Id.* at 737, 742.

And this is the Building as of January 6, 2023:



*Id.* at 892.

---

[5] This Policy language is consistent with Merriam-Webster's first two definitions of "collapse": (1) "to fall or shrink together abruptly and completely[;] fall into a jumbled or flattened mass through the force of external pressure" and (2) "to break down completely[;] DISINTEGRATE[.]" *Collapse*, MERRIAM-WEBSTER.COM, https://www.merriam-webster.com/dictionary/collapse (last visited Apr. 22, 2024).

By the Policy's terms, coverage does not apply to a building that is standing even if it is "cracking, bulging, sagging, bending, [or] leaning . . . ."  App. 589. Because the Building is still standing, it is at least "fairly debatable" whether the abrupt collapse provision applied.  *Hatch*, 842 P.2d at 1094.

Defendants, moreover, promptly investigated Saddletree's collapse theory once Saddletree raised it by retaining, and relying on, an independent expert.  Aple. Br. 15–16.  On January 16, 2022, Saddletree's expert opined that the Building's internal steel members buckled in a "*nearly instantaneous* unzipping type of collapse."  App. 858 (emphasis added).  Defendants' expert provided a supplemental report on March 17, 2022, which opined "the yielding and buckling . . . occurred *gradually* as snow accumulated on the roof and was not an instantaneous or abrupt failure."  *Id.* at 860 (emphasis added).  While these reports conflict on their face as to both the speed and nature of the failure, "conflicting opinions" between experts does not preclude granting summary judgment.  *Hatch*, 842 P.2d at 1093–94 (An insurer "is entitled to rely on the conclusion of [] independent experts" while pursuing a coverage debate.).

Both because it is "fairly debatable" whether the Building "collapsed" for purposes of coverage, and because Defendants were entitled to rely on their expert engineering report in making their coverage determination, *id.*, we affirm the district

12

court's entry of summary judgment for Defendants as to Saddletree's substantive bad faith claim.[6]

### C. Procedural Bad Faith

Lastly, Saddletree challenges the district court's entry of summary judgment for Defendants on its procedural bad faith claim. We affirm both because Defendants' conduct does not constitute procedural bad faith as a matter of law and because Saddletree has not identified recoverable damages necessary to sustain its claim.

#### 1. Conduct

Procedural bad faith requires an "egregious level of misconduct . . . ." *Cornhusker*, 786 F.3d at 859 (demonstrating the requisite level of insurer misconduct is a "high hurdle[.]"). Potential bases for procedural bad faith claims include:

> Deliberately misrepresent[ing] policy provisions to defeat coverage; ma[king] oppressive demands or impos[ing] burdensome requirements not contained in the policy; retaliat[ing] against the insureds in any way; unfairly impos[ing] premium increases; forc[ing insureds] to arbitrate or litigate, knowing that it had no substantial grounds to reject the claim; requir[ing insureds] to continue premium payments while it reviewed their claim;

---

[6] Saddletree alleges "[t]here is evidence of collusion between" Defendants and their expert. Aplt. Br. 44. If properly supported, this allegation would mean that Defendants are not entitled to rely on their expert report. *Hatch*, 842 P.2d at 1093. But Saddletree does not identify *any* evidence supporting this allegation. And "[w]ithout a specific reference, we will not search the record in an effort to determine whether there exists dormant evidence which might require submission of the case to a jury." *Gross v. Burggraf Const. Co.*, 53 F.3d 1531, 1546 (10th Cir. 1995) (internal quotations omitted)); *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 679 (10th Cir. 1998) ("Arguments inadequately briefed in the opening brief are waived . . . .").

> or undert[aking] any other action for which insurers have
> been held liable in first-party bad faith claims.

*Ahrenholtz*, 968 P.2d at 951 (citing *Hatch*, 842 P.2d at 1097).

In *Hatch*, for example, the Wyoming Supreme Court found procedural bad faith where "the insureds were required to file a 275-page inventory of household items and 'were told that they must list how many cornflakes were left in the cereal box before the fire, and how much salt was in the salt shaker.'" *Cornhusker*, 786 F.3d at 859 (citing *Hatch*, 842 P.2d at 1098). At bottom, "unless it is evident that the insurer performed *no form of satisfactory investigation*, a procedural bad-faith claim will not be viable." *Id.* (emphasis added).

Saddletree disputes the sufficiency of the investigation and conduct collateral to it. Specifically, it argues Defendants are liable for procedural bad faith for (1) initially refusing to turn over their engineering report and (2) allegedly not disclosing that the Building was unsafe to occupy during the winter months. We disagree.

Regarding the former, neither Saddletree (nor the district court) ever identified any legal authority requiring Defendants to have disclosed their engineering report. *Supra* (A)(1). Regarding the latter, Defendants have identified evidence in the record that Saddletree's sole member—David Gose—accompanied Defendants' engineers during their initial inspection of the Building. Aple. Br. 9. Following the inspection, Mr. Gose testified he "lock[ed] the doors" because the inspectors "said that the structure of the building was too weak." App. 544. From that point on, the Building's only use has been for Gose's personal storage. *Id.*

14

We conclude as a matter of law that this conduct fails to exhibit the "egregious level of misconduct" typifying bad faith. *See, e.g.*, *Cornhusker*, 786 F.3d at 859; *Hatch*, 842 P.2d at 1097–98.

### 2. Economic Damages

Independently, the district court also correctly concluded that Saddletree cannot sustain its procedural bad faith claim because it failed to identify economic damages flowing from Defendants' alleged conduct. *See Farmers Ins. Exch. v. Shirley*, 958 P.2d 1040, 1046–49 (Wyo. 1998). Damages available for procedural bad faith claims include damages for harm to pecuniary interests and damages for emotional distress. *Id.* at 1046.

Saddletree does not specifically articulate its damages theory (although on appeal it does disavow seeking emotional distress damages). Aplt. Br. 49–52. Here, as it did before the district court, it generally avers an entitlement to contract damages ostensibly owed under the Policy, profits lost because the Building cannot be operated as intended, and costs incurred to install temporary shoring. *See id.* But these damages are either foreclosed by our earlier conclusions or incidental to the loss itself—not Defendants' handling of the claim—meaning they are not recoverable as a remedy for procedural bad faith. *See Shirley*, 958 P.2d at 1046–49. *See also Rissler & McMurry Co. v. Sheridan Area Water Supply Joint Powers Bd.*, 929 P.2d 1228, 1235 (Wyo. 1996) (Barring recovery in tort economic damages which are recoverable under a governing contract).

15

### 3. *Subrogation*

Finally, Saddletree argues it is entitled to its attorneys' fees spent litigating against Dreams on the theory that Defendants should have provided the disputed coverage and later sought subrogation against Dreams. Aplt. Br. 52–53. Saddletree offers no authority in support of the position that an insurer is required to provide reasonably disputed coverage, only *later* to seek subrogation, to avoid liability for procedural bad faith.

Moreover, even if its Dreams' attorneys' fees were recoverable as relief for the procedural bad faith claim it asserts against Defendants, recovering those fees here would require an intermediate finding that Saddletree was both entitled to coverage *and* that it was Defendants' wrongful conduct in denying coverage that caused Saddletree to sue Dreams in the first place. That proposition is self-defeating at least because Saddletree admitted it has "no idea" whether it would have sued Defendants in place of Dreams even had it received their expert report sooner. App. 554–55, 1015.

Without economic damages Saddletree cannot sustain its claim. *See Shirley*, 958 P.2d at 1046. We affirm the district court.

* * *

For the foregoing reasons, we AFFIRM the district court's entry of summary judgment in Defendants' favor on all Saddletree's asserted claims.

Entered for the Court


Timothy M. Tymkovich
Circuit Judge