# IN THE SUPREME COURT, STATE OF WYOMING

## 2015 WY 19

OCTOBER TERM, A.D. 2014

*February 6, 2015*

JACOB HATCH, an Individual, and
DIAMOND POINT CONSTRUCTION,
INC., a Wyoming Corporation,

Appellants
(Defendants),

v.

CHRISTOPHER P. WALTON and
TAMMARA DUHN,

Appellees
(Plaintiffs).

CHRISTOPHER P. WALTON and
TAMMARA DUHN,

Appellants
(Plaintiffs),

v.

JACOB HATCH, an Individual, and
DIAMOND POINT CONSTRUCTION,
INC., a Wyoming Corporation,

Appellees
(Defendants).

S-14-0114, S-14-0115, S-14-0116

CHRISTOPHER P. WALTON and
TAMMARA DUHN,

Appellants
(Plaintiffs),

v.

JACOB HATCH, an Individual, and
DIAMOND POINT CONSTRUCTION,
INC., a Wyoming Corporation,

Appellees
(Defendants).

*Appeal from the District Court of Johnson County*
*The Honorable William J. Edelman, Judge*

***Representing Jacob Hatch and Diamond Point Construction, Inc.:***
Jeffrey J. Gonda and Amanda K. Roberts of Lonabaugh and Riggs, LLP, Sheridan, Wyoming. Argument by Ms. Roberts.

***Representing Christopher P. Walton and Tammara Duhn:***
Nathaniel S. Hibben of Doby & Hibben, Torrington, Wyoming

***Before BURKE, C.J., and HILL, KITE, DAVIS, JJ.****

**After this matter was taken under advisement, Justice Fox discovered she had a conflict and on October 22, 2014, she recused herself. Therefore, pursuant to the Wyoming Constitution, Art. 5, § 4(a), this matter was decided by a quorum of the Court.*

**NOTICE: This opinion is subject to formal revision before publication in Pacific Reporter Third. Readers are requested to notify the Clerk of the Supreme Court, Supreme Court Building, Cheyenne, Wyoming 82002, of any typographical or other formal errors so that correction may be made before final publication in the permanent volume.**

**DAVIS**, Justice.

[¶1]   Christopher Walton and Tammara Duhn (Walton and Duhn) hired Jacob Hatch and his Buffalo, Wyoming construction company, Diamond Point Construction (collectively, Hatch), as the general contractor to build a custom home in the Powder Horn subdivision in Sheridan County.  Unguided by a written contract, their relationship deteriorated, and Walton and Duhn sued Hatch and recovered a judgment.  In No. S-14-0114, Hatch challenges the damages the district court awarded to Walton and Dunn.  In Nos. S-14-0115 and 0116, Walton and Duhn challenge the district court's denial of a request for attorney fees.[1]  We reverse and remand on the two damages issues raised by Hatch, and we affirm the portion of the decision denying an award of attorney fees.

## ISSUES

[¶2]   The two issues raised by Hatch can be summarized as follows:

> I.   Did the district court err in calculating the damages that Walton and Duhn suffered as a result of Hatch's improper billing practices when it subtracted the amounts that should have been billed from the amounts Hatch actually billed, without taking into account that Walton and Duhn never paid the full amount billed?

> II.   Did the district court err in finding liability and awarding damages for breach of an implied warranty that the Walton and Duhn home would be built in a workmanlike manner?

The issue raised by Walton and Duhn can be best summarized by the following question:

> I.   Did the district court err in denying Walton's and Duhn's application for attorney fees, which was premised on the so-called "punitive damages exception" to the American rule that parties must pay their own attorney fees unless a contract or statute allows recovery?

## FACTS

---

[1] Walton and Duhn filed two notices of appeal, which resulted in the docketing of two separately numbered cases.  The first was filed to challenge the district court's failure to rule on their application for fees.  The second was from the court's eventual denial of that application.

1

[¶3]   Sometime in mid-2007, Walton and Duhn obtained house plans prepared by an architect from the internet.  The plans seemed well-suited to their sloping home site because they would allow all family members to live comfortably on the main floor, and they would permit the home to be oriented on the site so as to regulate its exposure to wind and sunlight.  A friend recommended Hatch as the general contractor, so they contacted him and began to plan the construction of their home with him.  After Walton and Duhn decided on changes they wanted made to the stock plans and specifications, Hatch incorporated them into sketches and had a local draftsman revise the plans accordingly.

[¶4]   Hatch drew up two proposed written contracts, one in which he would agree to build the home for a definite price, and one in which he would agree to build it for his cost plus 13%.  Walton and Duhn would not sign either one.  Nevertheless, construction began, evidently with both parties believing that Hatch would bill Walton and Duhn on a "cost-plus" basis.

[¶5]   To Walton and Duhn, that vague arrangement meant that Hatch would bill them for the amounts of invoices submitted to Hatch by various subcontractors and providers of construction materials, plus an additional charge of 13% of the total.  To their understanding, the 13% would be Hatch's only profit.  In Hatch's mind, however, his costs included a 10% markup on the subcontractors' and materialmen's invoices, which would cover his overhead on office expenses, insurance, fuel, and other expenses related to the use of company vehicles and other equipment.[2]  The 13% would then be calculated on the total of the invoices and the 10% markup.

[¶6]   Although the parties disagreed as to whether Hatch ever communicated his understanding of the term "costs" to Walton and Duhn, portions of the record indicate that he did not.  For instance, Hatch did not expressly define that term in the draft unsigned written "cost plus" contract he submitted to Walton and Duhn.  More importantly, he engaged in deceptive billing practices which came to be the primary source of the friction that eventually ended the relationship and set the course of litigation that was to follow.

[¶7]   Hatch instructed his bookkeeper to mark the invoices received from each individual subcontractor and materialman up by 10%.  However, that markup was not separately set out in any clear and obvious manner in the bills Hatch submitted.  Furthermore, when Walton and Duhn requested copies of the invoices submitted to Hatch by the subcontractors and material providers, he provided recreated or fabricated

---

[2] A wealth of testimony indicated that such is a standard practice in the construction industry, and one that is necessary if a contractor wishes to remain solvent.

substitutes, most often using accurate simulations of each company's letterhead and billing forms, but with 10% added to what had been charged on the original invoices.[3]

[¶8]    Walton and Duhn eventually discovered that Hatch was billing them for what, in their minds, was more than they had agreed to pay for their home's construction. As a result, they began to pay some of the subcontractors directly, and they began to question Hatch's calculations of what they owed other subcontractors and material providers. They withheld payment for any amounts they disputed.

[¶9]    By the end of July 2008, the dispute over what Walton and Duhn owed Hatch led him to terminate his and Diamond Point Construction's involvement in the project before the house was finished. He made arrangements for Walton and Duhn to deal directly with the subcontractors who were to complete the structure.

[¶10] Walton and Duhn sued Hatch in the district court for Sheridan County on September 8, 2011. They made claims of breach of contract (both in billing and in construction of the house), conversion, unjust enrichment, fraud, and breach of warranty. Hatch's answer and counterclaim asserted that there had been no meeting of the minds between the parties as to the terms of any oral contract[4] and that Walton and Duhn suffered no damages because they owed him money for the work he had done. Hatch alleged that they had withheld payment of a substantial portion of the amounts billed in the final invoice he submitted to them. He counterclaimed, contending that when all was taken into account, Walton and Duhn had been unjustly enriched by at least $28,935.83.

[¶11] On November 12, 2013, after considering the testimony and exhibits presented at a two-day bench trial in mid-September of that year, the district court issued *Findings of Fact, Conclusions of Law and Judgement* [sic]. It attached a spreadsheet it had created which identified, by Hatch's invoice numbers, his charges to Walton and Duhn, what he actually paid to subcontractors and materialmen for the charged items, his 13% contractor's fee, and the difference between the two.

[¶12] Chief among the district court's determinations is that Hatch and Walton and Duhn were bound by an oral contract that required Hatch to build the home for 13% above what he paid for materials and to subcontractors. The court also determined that Hatch had billed Walton and Duhn for more than the agreed price, and that he committed fraud by misrepresenting the amounts of the invoices he received from suppliers and subcontractors. It found that Hatch billed Walton and Duhn a total of $628,264.43, but

---

[3] The record does not indicate whether Hatch ordered his bookkeeper to create the fictional invoices or whether she came up with the idea herself. That question is of little moment to this appeal, however, because Hatch conceded that his construction company knowingly submitted the simulations when Walton and Duhn requested the originals, and that Hatch assured them he was providing the originals.

[4] Although the pleading is less than clear on this point, it appears that Hatch was referring to what he later characterized as the parties' differing interpretations of the term "cost."

that the oral cost-plus contract only allowed him to bill a total of $565,885.56. Consequently, the court awarded Walton and Duhn the difference between those sums, $62,378.67, in damages for Hatch's misrepresentations.

[¶13] The district court also determined that the parties' contract carried an implied warranty that Hatch would build the house in a skillful and workmanlike fashion, and that Walton and Duhn had carried their burden of proving that a deck, concrete in the driveway, and an in-floor electrical heating system needed repair as a result of poor workmanship. The court therefore awarded the claimed cost of those repairs, $15,250.00, as damages for breach of the implied warranty.

[¶14] The district court's conclusions of law also included the following, drawn in large part from proposed findings and conclusions submitted by Walton and Duhn:

> Because fraud occurred, punitive damages and attorney fees can be awarded. Both punitive damages and attorney fees are appropriate, and can be awarded a prevailing plaintiff when a fraud has been committed. *See generally Meduna* [*Alexander v. Meduna*, 2002 WY 83, 47 P.3d 206 (Wyo. 2002)] 2002 WY at ¶ 42-43, ¶ 49. In considering to award punitive damages or attorney's fees, the Court finds that given the egregious and willful conduct of Defendant Hatch, that as the prevailing party, Plaintiffs shall also be awarded their reasonable attorney fees. Counsel for Plaintiff shall submit to the court an affidavit and other information supporting the time expended in representing Plaintiff in this action. That information shall be submitted on or before November 22, 2013.

[¶15] Not surprisingly, Walton and Duhn accepted the court's invitation and filed an application for attorney fees on November 25, 2013.[5] That same day, Hatch filed a motion to alter or amend the damages portion of the court's judgment, contending that the damage award was contrary to evidence that Walton and Duhn paid substantially less than the amounts billed through Hatch's Invoice Nos. 3546 and 3549. He further asserted that because of these underpayments, the Plaintiffs had not paid him the money the court determined he was entitled to under the contract, and that the shortfall exceeded the actual damages award it made on the fraudulent misrepresentation claim. In short, Hatch contended that his misrepresentations caused Walton and Duhn no damage and that they should be ordered to pay what they still owed him.

---

[5] The application noted that Walton and Duhn's counsel handled the case on a contingent fee basis, and did not therefore keep detailed time records. The application offered the court the alternative of awarding the amount of the contingent fee or a lesser amount based on an approximation of the time counsel actually spent.

4

[¶16]  On February 21, 2014, Hatch filed his notice of appeal from the district court's judgment, noting that the court had not ruled on his motion and that it would be deemed denied on February 25.  There is no ruling on the motion in the record.

[¶17]  On March 26, 2014, the court ruled on Walton and Duhn's motion for attorney fees.  Paradoxically, although it had previously held that those fees would be awarded as a component of punitive damages, it now held that under the American Rule, they could only be recovered if there was a statute or contract providing for such an award.  Since there was neither, the application for attorney fees was denied.  As noted above, Walton and Duhn timely appealed that ruling.

## DISCUSSION

[¶18]  Before considering the issues raised, it is important to acknowledge the aspects of the district court's judgment which have not been challenged by either party.  No one contests the court's finding that they entered into an oral contract by which Hatch would be paid only for the amounts actually billed by his subcontractors and suppliers, plus an additional 13% for his profit.  Moreover, no one contested the findings that, under the contract, Hatch was entitled to be paid $565,885.56, but that he had billed Walton and Duhn $628,264.43.  Finally, neither Hatch nor Walton and Duhn challenge the court's finding that, in the course of billing Walton and Duhn, Hatch fraudulently misrepresented that the fabricated and inflated invoices used to support his billings were accurate copies of the originals.

**The Actual Damages Suffered by Virtue of Hatch's Billing Practices**

[¶19]  Hatch's first argument assumes that the above findings are correct.  However, he contends that even if he was bound to the contract described by the district court, and even if he overbilled Walton and Duhn by slightly more than $62,378 and misrepresented the authenticity of the copies of the subcontractor invoices he presented, the contract nevertheless required them to pay $565,885.56, and that Walton and Duhn have not paid that much.  He points out that, contrary to the district court's determination, the amount he overbilled can accurately represent the damages suffered by Walton and Duhn only if one accepts the court's finding that they paid him or his subcontractors or suppliers the amounts he billed them.  That finding, Hatch contends, is erroneous and cannot be squared with the evidence at trial.

[¶20]  When this Court reviews factual findings after a bench trial, we apply a clearly erroneous standard.  We accord a degree of deference to the trial court and will decline to reweigh the evidence.  However, we will set aside a factual finding that is unsupported by the record, and will do likewise even in the face of some supporting evidence when all of the evidence leaves us with the definite and firm conviction that the trial court has made a

mistake. *Garrison v. CC Builders, Inc.,* 2008 WY 34, ¶ 22, 179 P.3d 867, 873-74 (Wyo. 2008). That standard extends to findings as to damages. *Cross v. Berg Lumber Co.,* 7 P.3d 922, 928 (Wyo. 2000).

[¶21] Hatch conceded prior to trial that Walton and Duhn had fully paid all of the invoices he submitted, except for Invoice Nos. 3546 and 3549. When they received the first of these, they met with Hatch to discuss which of the invoiced amounts they would pay and how much of them they would pay, and they then began to contact and pay selected subcontractors directly. Of the $38,230.59 billed on Invoice 3546, Walton and Duhn paid Hatch $16,058.45.

[¶22] Invoice No. 3546 contained the following charges:

| | |
|---|---|
| CC Insulation | $ 3,068.00 |
| Big Horn Interiors | $16,000.00 |
| Bleumel Plumbing | $ 5,563.01 |
| Sherwin-Williams | $ 20.31 |
| Cowboy State Electric | $ 6,800.00 |
| KBM & M (porta toilets) | $ 93.70 |
| Jobsite Services | $ 741.52 |
| Montana Dakota Utilities | $ 28.04 |
| KBL Technologies | $ 5,916.01 |

The district court resolved the evidentiary conflicts relating to this and other invoices in the spreadsheet attached to its judgment. The court concluded that Hatch had overcharged with respect to CC Insulation by $275.81, that he had overcharged by $6,000 with respect to Big Horn Exterior, and that he had done the same as to Cowboy State Electric by $3,400. It also found that Hatch had undercharged his 13% contractor's fee by $3,712.08. It tallied all these discrepancies together with those found in other invoices in determining the extent to which Walton and Duhn suffered any damages. As noted above, the court calculated the total damages from all the inflated invoices at $62,378.67.

[¶23] The problem with that conclusion is that Walton and Duhn never paid anyone the amounts Hatch overcharged with respect to those three subcontractors. Mr. Walton himself testified that he paid none of the amount invoiced for CC Insulation to either

6

Hatch or the subcontractor, and that he did not pay the overcharges on the fabricated copies of the invoices from the other two subcontractors. He instead contacted the subcontractors and paid them or Hatch only the amounts he was obligated to pay under the contract. Therefore, the total amount listed as overcharges relating to those subcontractors on Invoice No. 3546, $9,675.81, should be deducted from the total damages figure of $62,378.67, leaving a remainder of $52,702.86.

[¶24] Invoice No. 3549 presents an even greater discrepancy. That invoice contains the following charges:

| | |
|---|---|
| Big Horn Exteriors | $18,000.00 |
| American Drywall | $16,360.00 |
| Sherwin-Williams | $ 667.38 |
| Bleumel Plumbing | $ 289.02 |
| JB Sheetmetal | $ 5,811.00 |
| Knecht Home Center | $17,068.13 |
| Jobsite Services | $ 1,335.64 |
| Sheridan Commercial Company | $ 3,488.16 |
| Cowboy State Electric | $ 1,121.35 |
| Forklift Rental | $ 2,750.00 |

The district court's spreadsheet listed overbillings of $2,000 for Big Horn Exteriors, $3,022 for American Drywall, $741.52 for Jobsite Services, and $606.70 for Cowboy State Electric. Once again, however, Walton and Duhn did not pay the amounts Hatch overbilled.

[¶25] They contacted Big Horn Exteriors, American Drywall, and JB Sheetmetal, and paid them only what they actually owed. They likewise did not pay the amount Hatch overbilled for Jobsite Services. The same is true with respect to Cowboy State Electric. After receiving Invoice No. 3549, Walton and Duhn issued a check to Hatch for $3,400, which represents what they at that time actually still owed Cowboy State Electric. Hatch in turn wrote a check to Cowboy State Electric for $3,914.65. Subtracting Walton's $3,400 from that amount yields $514.65, the amount which the district court determined

7

was all Walton and Duhn owed the electrician with respect to Invoice No. 3549 and what they paid Hatch.

[¶26] Walton and Duhn did not therefore pay any portion of the amounts they were overbilled in relation to those four subcontractors, which totals $6,370.22. After adjusting the district court's total damages figure for the errors relating to Invoice No. 3546, we were left with $52,702.86. We must now deduct an additional $6,370.22, leaving a remainder of $46,332.64.

[¶27] However, we are still not finished with Invoice No. 3549. During cross-examination regarding both that invoice and documents relating to it, Walton conceded that Hatch had written checks to four subcontractors or suppliers we did not discuss above. He agreed that, consistent with the invoice, Hatch wrote a check to Sherwin-Williams for $667.38, a check to Bleumel Plumbing for $289.02, and two checks totaling $3,488.16 to Sheridan Commercial Company. His testimony, along with documentary evidence, also indicated that Hatch wrote two checks to Knecht Home Center totaling $21,158.15 for materials used in the home. One for $17,311.30 roughly corresponded to the amount listed on Invoice No. 3549, and one for $3,846.85 was apparently for partial payment of the balance listed on Knecht's April 30, 2008 statement to Hatch, which had not been included on any of Hatch's invoices to Walton and Duhn after that date.[6]

[¶28] Hatch's checks to those businesses totaled $25,602.71, and Mr. Walton conceded he paid Hatch only $9,398.03 toward that sum. The difference, $16,204.68, must be deducted from our previously adjusted figure of $46,332.64, which means that damages of $30,127.96 resulted from Hatch's misrepresentations. Therefore, while we conclude that Walton and Duhn did in fact suffer damages as the result of Hatch's misrepresentations concerning the invoices, we find the damage calculation to be incorrect and set it aside. The district court should correct the award on remand.

**Evidence of Breach of the Implied Warranty**

[¶29] Hatch contends that Walton and Duhn introduced no expert testimony as to whether he breached the implied warranty that he would build their house in a skillful and workmanlike manner and otherwise failed to carry their burden of proving a breach of the warranty. Proving a breach of the warranty of this kind requires evidence of a violation of the standard of workmanship. 13 Am. Jur. 2d *Building and Construction Contracts* §§ 12, 29 (updated Feb. 2015); *Carter v. Krueger*, 916 S.W.2d 932, 935 (Tenn. Ct. App. 1995). As is also the case in tort actions, that in turn requires the testimony of someone with sufficient expertise to set out the appropriate standard of care and describe

---

[6] The $17,068.13 listed on Invoice No. 3549 is apparently the balance due on that April statement, less Knecht's finance charge, plus the new charges listed on Knecht's May 31, 2008 statement, less its finance charge.

how the contractor fell below it. *Kemper Architects, P.C. v. McFall, Konkel & Kimball Consulting Eng'rs*, 843 P.2d 1178, 1186 (Wyo. 1992). One must produce witnesses who can identify an alleged construction defect with some particularity, show that the contractor's acts or omissions created the defect, and show that those acts or omissions derived from the contractor's failure to exercise, with respect to that specific defective aspect of the project, the level of skill and workmanship expected of others in his profession. *See Carter*, 916 S.W.2d at 935.

[¶30] Whether a suit sounds in tort or contract, if the law requires expert testimony to show that the defendant's conduct is subject to a standard, and that his specific acts or omissions violated that standard, a plaintiff who introduces no such expert testimony to establish a breach of the standard raises no fact issue to submit to the trier of fact. *Govin v. Hunter*, 374 P.2d 421, 424 (Wyo. 1962). *See also Garaman, Inc. v. Williams*, 912 P.2d 1121, 1124 (Wyo. 1996) (where such evidence is lacking, a district court may properly grant judgment as a matter of law).

[¶31] Mr. Walton complained about the columns supporting the main-floor deck on the southwest side of his house.[7] He testified that a structural engineer assessed the situation, and that the engineer said the deck was not structurally sound because it needed to have a column added "in the middle on the basement." Consequently, he hired another contractor to rectify the problem. That was the full extent of his testimony on the breach of warranty issue.

[¶32] Ms. Duhn testified as to the complaints she and Walton had about the quality of construction. Of those that are relevant to this appeal, she referred to Walton's complaint about the deck column and said they paid $6,100 to fix that problem and to replace some broken concrete on the basement-level patio under the deck. She also appeared[8] to claim that, because there were pools of water next to the house, they paid $8,500 to have the soil graded so the water would flow away from it and not go into the ground. Finally, she testified that they could not figure out how to make the radiant floor heating system work, so they paid an electrician $650 to solve the problem, which she claimed was that "the electric part wasn't hooked up properly."

---

[7] Walton first said the plans and specifications required four columns to support the deck, then corrected himself and stated that three were specified to run from the basement/patio level to the deck and three were to run from the deck to the roof. However, the plans for the house show that five decorative columns were to be placed on the deck, and that three wrapped columns of unspecified materials were to support the deck.

[8] We exercise some caution here. Her brief testimony conveys to us that she was talking about dirt work. Although she never mentioned concrete, the district court characterized this as work on a driveway that was supposed to be constructed from concrete. This lack of specificity as to the nature of the claimed defect can hardly be said sufficient to support a breach of warranty allegation.

[¶33] From this limited testimony, the district court determined that "Plaintiff[]s paid $6,100.00 to repair the deck, $8,500.00 to repair the driveway and $650.00 to repair the in-floor hea[t]ing/electrical" due to Hatch's breach of his implied warranty to construct the home in a skillful and workmanlike manner. There are several problems with this determination.

[¶34] As to the alleged insufficiency of the columns supporting the deck, there was no evidence that the structure was not built according to the plans and specifications Walton and Duhn provided to Hatch, or that its allegedly unsound nature resulted from poor construction rather than poor engineering by the architect from whom Walton and Duhn purchased the plans. It is well settled that a contractor who follows the plans and specifications provided by an owner is not liable for defects in a building due to faulty design, because a contractor guarantees only the skill with which he performs his work, not the sufficiency of the plans and specifications. *Farmer v. Rickard*, 2007 WY 19, ¶ 14, 150 P.3d 1185, 1191 (Wyo. 2007). Absent evidence that Hatch deviated from the plans in erecting the columns and deck, the district court had no legal basis for finding that he breached his implied warranty in that regard.

[¶35] Similarly, Walton and Duhn produced no evidence of a defect in the concrete driveway caused by faulty workmanship, and there was no evidence that Walton and Duhn spent $8,500 to repair such a defect. Ms. Duhn testified to spending that much to resolve drainage issues to prevent water from going into the ground around the foundation. Moreover, no expert evidence was presented to establish the standard of workmanship required with respect to those aspects of the construction, or to show that any problems were created by Hatch's failure to meet that standard, rather than some other cause.[9] We can find no evidence sufficient to establish even the rudiments of an implied warranty claim relating to Walton's $8,500 expenditure.

[¶36] With respect to the radiant floor heating, Ms. Duhn's assertion that "the electric part wasn't hooked up properly" so that they could figure out how to make the system work hardly suffices as an expert explanation of how it was hooked up or why it was wrong to do it that way. It certainly does not show that the alleged defect was a deviation from the standard of skill and workmanship expected of Hatch or his subcontractors.

[¶37] In sum, Walton and Duhn attempted to prove a breach of the implied warranty by showing little more than that something was not right with three aspects of their house, and that they paid to have additional work done in those areas. The district court seems to have adopted that view. As noted above, however, expert testimony was required to

---

[9] Other possible causes include two solid weeks of rain and resulting subsidence after the foundation was backfilled, and the dissolution of Hatch's and Walton's relationship before the site was ready for final landscaping. Nothing in the record indicates that the contract required landscaping work.

prove a defect resulted from substandard workmanship as a matter of law. Accordingly, we reverse and remand for elimination of this award from the judgment.

**Request for Attorney Fees**

[¶38] In their proposed findings of fact and conclusions of law, Walton and Duhn suggested that the district court impose punitive damages to compel Hatch to disgorge the 13% profit he made on their home, and that it award them attorney fees as punitive damages. In its original order, the court allowed Hatch to keep his profit. The judgment indicated that they might nevertheless be able to recover attorney fees. The judgment is not entirely clear as to whether the district court intended to award attorney fees as a form of punitive damages, or if it believed that attorney fees might somehow be awarded independently because fraud was found.

[¶39] Walton and Duhn consequently filed a request for their attorney fees. The district court denied that request, concluding that it could award attorney fees only if a contract or statute permitted them to be awarded.

[¶40] In its original judgment, the district court cited *Alexander v. Meduna*, 2002 WY 83, 47 P.3d 206 (Wyo. 2002), suggesting that Walton might be awarded attorney fees in this case. However, in its order denying their request for fees, the district court noted that under the American Rule regarding attorney fees, each party to civil litigation must pay his own litigation costs, unless an express contractual or statutory provision says otherwise. Walton and Duhn now argue that the district court was correct in the judgment, but that it erred in its later order.

[¶41] *Alexander* holds that attorney fees are recoverable under the American Rule only where a contractual or statutory provision authorizes such recovery, or as a form of punitive damages when such damages can properly be awarded. *Alexander*, ¶ 49, 47 P.3d at 220-21. As to the propriety of awarding punitive damages, *Alexander* harkens back to *Farmers Insurance Exchange v. Shirley*, 958 P.2d 1040 (Wyo. 1998). *Alexander*, ¶ 42, 47 P.3d at 219.

[¶42] In *Shirley*, this Court applied factors the United States Supreme Court held to be proper in *BMW of North America, Inc. v. Gore*, 517 U.S. 559, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996), and cited with approval factors adopted by the Supreme Court of Alabama.[10] The factors approved in *Shirley* are:

> (1) Punitive damages should bear a reasonable relationship to the harm that is likely to occur from the defendant's conduct

---

[10] *Green Oil v. Hornsby*, 539 So.2d 218, 223-24 (Ala. 1989), and the concurring opinion of Justice Houston in *Aetna Life Ins. Co. v. Lavoie*, 505 So.2d 1050, 1062 (Ala. 1987).

11

as well as to the harm that actually has occurred. If the actual or likely harm is slight, the damages should be relatively small. If grievous, the damages should be much greater.

(2) The degree of reprehensibility of the defendant's conduct should be considered. The duration of this conduct, the degree of the defendant's awareness of any hazard which his conduct has caused or is likely to cause, and any concealment or "cover-up" of that hazard, and the existence and frequency of similar past conduct should all be relevant in determining this degree of reprehensibility.

(3) If the wrongful conduct was profitable to the defendant, the punitive damages should remove the profit and should be in excess of the profit, so that the defendant recognizes a loss.

(4) The financial position of the defendant would be relevant.

(5) All the costs of litigation should be included, so as to encourage plaintiffs to bring wrongdoers to trial.

(6) If criminal sanctions have been imposed on the defendant for his conduct, this should be taken into account in mitigation of the punitive damages award.

(7) If there have been other civil actions against the same defendant, based on the same conduct, this should be taken into account in mitigation of the punitive damages award.

*Shirley*, 958 P.2d at 1044. There is no right to punitive damages, which are awarded to punish conduct involving some element of outrage similar to that usually found in a crime. *Alexander*, ¶¶ 40-41, 47 P.3d at 218 (citing *Sheridan Commercial Park, Inc. v. Briggs*, 848 P.2d 811, 817-18 (Wyo. 1993)).

[¶43] We review a decision awarding or declining to award punitive damages for an abuse of discretion. *Rosty v. Skaj*, 2012 WY 28, ¶ 33, 272 P.3d 947, 958 (Wyo. 2012) (citing *Alexander*, ¶ 41, 47 P.3d at 219). As we have explained:

A court does not abuse its discretion unless it acts in a manner which exceeds the bounds of reason under the circumstances. Our review entails evaluation of the sufficiency of the evidence to support the district court's decision, and we afford the prevailing party every favorable inference while

12

omitting any consideration of evidence presented by the unsuccessful party. Findings of fact not supported by the evidence, contrary to the evidence, or against the great weight of the evidence cannot be sustained.

*Rosty,* ¶ 33, 272 P.3d at 958 (quoting *Vargas Ltd. P'ship v. Four "H" Ranches Architectural Control Comm.*, 2009 WY 26, ¶ 10, 202 P.3d 1045, 1050 (Wyo. 2009), and *Witowski v. Roosevelt*, 2009 WY 5, ¶ 13, 199 P.3d 1072, 1076 (Wyo. 2009)).

[¶44] In this case, the district court initially held that Hatch's conduct was sufficiently outrageous to justify an award of punitive damages in the form of attorney fees, and said it would consider an application for them. The court evidently later concluded that such an award was not necessary, although its decision on this point could have been clearer. The record does not contain sufficient evidence of the factors set forth in *Gore* and *Shirley* to allow a determination of the amount of any award.[11] We have previously held that an award of punitive damages cannot be sustained if evidence of the defendant's wealth was not presented, and it was not in this case. *Adel v. Parkhurst,* 681 P.2d 886, 892 (Wyo.1984). We have also held that a court may reconsider its decisions before entry of a final judgment. *Steranko v. Dunks*, 2009 WY 9, ¶ 6, 199 P.3d 1096, 1097 (Wyo. 2009). The district court did not abuse its discretion in declining to award punitive damages.

[¶45] Walton and Duhn do not claim that any contractual or statutory provision permits them to recover attorney fees, and the district court did not ultimately award attorney fees as punitive damages. Consequently, we will affirm its decision in that respect.

## CONCLUSION

[¶46] The district court's calculation of the actual damages caused by Hatch's billing practices was clearly erroneous, and the evidence was insufficient to support a finding that Hatch breached the implied warranty of workmanship and damaged Walton. We therefore reverse and remand for the district court to correct its damages calculations in accordance with this opinion. The court did not abuse its discretion in declining to award attorney fees as punitive damages. Affirmed in part and reversed and remanded in part.

---

[11] In a jury trial, the court must bifurcate proceedings to determine the amount of punitive damages from the trial on the merits, at which the jury must only determine whether a defendant's conduct was sufficiently egregious to warrant any award of exemplary damages if it awards compensatory damages. *Ruwart v. Wagner*, 880 P.2d 586, 593 (Wyo. 1994) (citing *Campen v. Stone*, 635 P.2d 1121, 1127 (Wyo. 1981)). Bifurcation would have been unnecessary and futile in a bench trial.